**SOCIALIST WORKERS PARTY and Young Socialist Alliance, et al., Plaintiffs,**

**v.**

**ATTORNEY GENERAL OF the UNITED STATES et al., Defendant.**

**No. 73 Civ. 3160.**

United States District Court, S. D. New York.

Dec. 13, 1974.

Leonard B. Boudin, Herbert Jordan, and K. Randlett Walster, Rabinowitz, Boudin & Standard, New York City, for plaintiffs.

Paul J. Curran, U. S. Atty., Steven J. Glassman, and John Siffert, New York City, Asst. U. S. Attys., for the Southern District of New York.

## OPINION OF THE COURT

GRIESA, District Judge.

This is a motion brought by plaintiffs for a preliminary injunction restraining one of the defendants, namely, the Director of the Federal Bureau of Investigation, from having his organization conduct any surveillance or monitoring of the 14th National Convention of the Young Socialist Alliance, planned to be held at the Jefferson Hotel in St. Louis, Missouri, from December 28, 1974 through January 1, 1975.

I will refer to the Young Socialist Alliance as the YSA, as we have done in the arguments.

The YSA is one of the plaintiffs in this action, which seeks broad relief against what the plaintiffs consider to be the illegal surveillance and harassment carried on by the various governmental officials and agencies against the plaintiffs.

The YSA is an unincorporated association, with headquarters in New York. Its basic function is that it is the youth arm of another one of the plaintiffs, namely, the Socialist Workers Party, which I will refer to as the SWP.

Both the SWP and the YSA advocate the replacement of capitalism with socialism in the United States. Their specific doctrines will be discussed at greater length later in my opinion.

The motion for preliminary injunction is granted, for the following reasons.

Let me first summarize the salient facts.

The record indicates that the YSA convention will be open to delegates and also other young people under the age of twenty-nine, which is the cut-off age for the YSA. The convention will be open to other young people interested in learning about the YSA and the SWP. There will be workshops, panel discussions and other meetings, at which both members and other interested young people will be permitted to attend. There will apparently be official delegates to this convention which will have certain voting rights, and there will be at least one meeting where only the delegates are permitted for the purposes of voting for the YSA National Committee.

One of the principal events of the convention will be the announcement by the SWP of its candidates for president and vice president of the United States for the 1976 election. It is planned to have a rally at the Hotel Jefferson, at which this announcement is made. The public will be invited to this rally.

Although the meetings contemplated have various degrees of public or private characteristics, as I have described, basically the intention is to have only persons coming to participate in the meetings as interested observers or participants, and it would appear that if someone attempted to attend any of these meetings and was considered undesirable by the YSA or the SWP, those organizations would have the right to refuse admission to such unwanted persons.

It appears that the FBI has for many years had an investigatory interest in the SWP and the YSA, because it has considered that these organizations are Marxist revolutionary organizations, whose purpose is the illegal overthrow of the United States Government.

The FBI apparently has for many years carried on surveillance at the National Conventions and other meetings of the YSA and also of the SWP. The FBI has stated plainly in this action and has otherwise indicated that it intends, unless barred by court order, to carry out surveillance of the YSA convention coming up on December 28th. Indeed,

in August or September of this year, the FBI paid a call to the offices of the Hotel Jefferson to inquire about what banquet rooms and guest rooms were being reserved for YSA convention attendance, and the FBI told the hotel management that it would carry out surveillance of the convention.

The FBI has filed affidavits stating that it intends to have confidential informants attending the convention meetings to find out the identity of persons attending and to find out the substance of the discussions held.

The FBI denies that it intends any electronic surveillance or searches or photographing.

The YSA claims that this proposed surveillance has placed or threatens to place a substantial inhibition on the ability of the YSA and its members and other persons who would be interested in attending to carry out the convention in a free and normal manner.

One of the principal reasons why it is plain that the FBI proposed surveillance will place restrictions on the convention is related to what the FBI intends to do with the information obtained from the surveillance. The record demonstrates quite clearly that the FBI, despite the abolition of the well-known Attorney General's list, still considers that the SWP and the YSA are revolutionary organizations, dedicated to the overthrow of the constitutional form of government of the United States by force and violence.

It appears that when the FBI learns of a person's affiliation with the YSA or the SWP or learns of a person's attendance at the meetings of those organizations, the FBI records such information in its files. A principal use of such information is to inform United States Government departments and agencies of such facts in the event that an SWP or YSA member or someone attending its functions seeks employment with such government department or agency.

It appears that the FBI informs the government department or agency of the

connection of the person with the YSA or the SWP and states to the government department or agency that these organizations are dedicated to violent revolution in the way that I have described. This results in obvious problems to the persons seeking the government employment, including being subjected to extremely searching questioning about political beliefs.

The record does not disclose in detail what does and does not happen in the case of such employment applications, but it appears clear to me that the procedure does place a very substantial onus and burden upon the persons involved.

Returning to discussion of the upcoming convention, the record shows quite clearly that the FBI surveillance of such meetings and the FBI procedures as far as use of information is concerned are quite well known among persons who consider attending the YSA conventions and that they operate as a substantial deterrent to such attendance. The record shows that persons who have been engaged in attempting to recruit attendance for the conventions have encountered instances of people who state that they would be interested in attending but are afraid to attend because of this FBI surveillance.

Beyond the specific instances which have been cited in the affidavits, it appears to me that a natural consequence under the circumstances is that the FBI surveillance would inevitably put a substantial inhibition and barrier upon the normal carrying out of these meetings and the normal ability to attract young persons to attend them.

It seems to me also clear that the fear of people with regard to attending at the meetings is not a mere mirage but is a reasonable fear in light of what the FBI does with the information obtained by it at these meetings.

There are other facts to be discussed at a later point, but this is probably the appropriate juncture to discuss the first question of law.

The threshold question of law to be dealt with is whether there is a justiciable controversy. This is the Government's formulation of the question, and I think it is probably a satisfactory one.

The plaintiffs are relying upon a contention that their First Amendment rights of freedom of speech and freedom of association are threatened with substantial impairment. The defendants deny this contention and rely on the line of authorities which hold that if there is no actual prohibition against the exercise of First Amendment freedoms but merely a subjective, self-induced chill on the exercise of those rights and freedoms, then there is no cognizable right upon which a court can grant relief.

The principal reliance of the Government is upon the Supreme Court decision in Laird v. Tatum, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154, a decision in 1972. The majority opinion in that case was written by Chief Justice Burger and joined in by Justices White, Blackmun, Powell and Rehnquist. Justices Douglas, Marshall, Harlan and Stewart dissented.

The case dealt with intelligence gathering activities of the United States Army which were being carried out to help meet the instances of domestic violence and terrorism which were being carried out and threatened at that period.

The plaintiffs in that action filed suit, claiming that their political rights, their First Amendment rights were being inhibited and stifled by this intelligence gathering activity of the United States Army.

The majority opinion held that there was no valid cause of action. At page 13 of the majority opinion, there is a statement of the holding that there was no indication that the plaintiffs had sustained or were immediately in danger of sustaining a direct injury as a result of the Army's actions. There was merely the amorphous claim that the very existence of the Army's data gathering system created somehow a chilling effect on

First Amendment rights. In other words, the specific claim of a specific injury which is presented in this case was not presented in Laird v. Tatum.

I do not mean to oversimplify the application of the Laird v. Tatum opinion. The questions I raised in oral argument are difficult ones. There is language at page 11 in the opinion which the Government with much force argues applies directly to our present case and prevents relief here. However, I believe that the Laird v. Tatum opinion must be applied on its facts and that the language of the majority opinion must be read in the context of those facts, and on this basis I am holding that the Laird v. Tatum opinion does not preclude relief in the present case.

Another case relied on by the Government is the Second Circuit decision in Fifth Avenue Peace Parade v. Gray, 480 F.2d 326 (2nd Cir. 1973). To me, this case is clearly inapplicable. There, the FBI activity had an entirely different purpose from what is contemplated here. The FBI was seeking information about the numbers of demonstrators which would be converging on Washington for the Vietnam Moratorium in November 1969.

The Court of Appeals, in an opinion written by Judge Mulligan, relied specifically on that fact. He further noted that there was no attempt to make notations about identities of persons, no attempt to use or gain information for any other purpose than to insure the orderly handling of crowds in connection with this moratorium. Consequently, he held that there was no reasonable basis for finding any chill whatever upon the First Amendment rights of the plaintiffs.

■ It seems to me that the line of authority which is relevant is found in the cases which have held that First Amendment rights can be violated by disclosure of membership in controversial organizations. I refer to Gibson v. Florida Legislative Commission, 372 U.S. 539, 83 S.Ct. 889, 9 L.Ed.2d 929, and other, similar cases. These authorities hold that there is a valid First Amendment claim presented when a governmental authority seeks to obtain information about the identities of the members of organizations such as the NAACP or the Republican Party in Southern states et cetera, and that the organizations have standing to protect their members from unwarranted invasions by the government of rights to association and privacy.

One of the ideas used in the reasoning of these cases is that when the objective of a group is unpopular at a given time, revelation of the identities of those who have joined together may provoke reprisals from those opposed to the group.

I believe that those cases apply here, in view of the fact that one of the principal activities, if not the principal activity of the FBI in the contemplated surveillance would be to record the identities of the parties for use in the manner which I have described.

■ I realize that there are distinctions which can be drawn between the present case and the membership list cases. For instance, it can be argued that when people attend a public or semi-public meeting, they somehow waive the right to privacy which is protected in the membership list cases. However, on balance, I find that that distinction is not a compelling one. I do not believe that a person who attends a meeting such as the one we are talking about inevitably waives his right to have his attendance a more or less private matter and not subject to Government surveillance. If he goes beyond this and manages to get his picture and name published in the party paper or something like that, this would be a different matter, but we are not talking about that kind of people. We are talking about the rank and file of the young people who apparently wish to attend this type of meeting with something less than that much notoriety.

■ Finally, we are dealing with the basic problem of inhibiting the right of

association, and the record before me indicates convincingly that the presence of FBI informants at the meeting will do this. In my view, this is sufficient ground for holding that there is a justiciable controversy about the invasion of First Amendment rights.

The case most directly on point is a case decided by the then District Judge Swygert, who is now Chief Judge of the Seventh Circuit, and I have reference to Local 309 v. Gates, 75 F.Supp. 620, a case decided in the Northern District of Indiana in 1948. Judge Swygert held that a union was entitled to injunctive relief against police surveillance at union meetings, that there was a strike in progress, and there had been violence in connection with the strike.

The police argued that they were entitled to monitor the meetings in order, among other reasons, to check on possible violence. Judge Swygert found as a fact that although there had been violence in the strike, there was no indication that the meetings had any relationship to violence. He further found that the inhibiting effect upon right of association was a natural result of the surveillance. He found factual indications of such inhibiting effect and granted the injunctive relief on the basis of First Amendment violations.

The second branch of our problem relates to the question of whether the Government has a valid reason for invading the First Amendment rights, that is, whether there is a sufficiently compelling interest or a sufficient interest of any kind on the part of the FBI which would justify it to carry out the activity with the effects which I have just described.

This brings up the question which has occupied us at great length, that is, whether indeed there is any indication that the upcoming meeting of the YSA will have any relation to violence, illegal activity of any kind.

We have had extensive proof and discussion on this point, which I will not attempt to describe in full detail now. I think it can be summarized as follows:

The YSA and the SWP are loyal to the teachings of Marx, Lenin and Trotsky. In 1938, the SWP subscribed or promulgated a declaration of principles which said, as quoted in the materials before me, that at all times the organizations would contend against the fatal illusion that the masses can accomplish their emancipation through the ballot box.

Although this does not specifically advocate violence and illegal activity, the Government urges with some reason that such is implicit in the statement. However, this is a declaration made some thirty-six years ago. The record is undisputed that the declaration was repudiated by the SWP in 1940. The Government contends that this was merely a subterfuge to avoid the application of certain legal strictures. The plaintiffs contend that the repudiation of violence or the amendment of the original declaration of principles was utterly sincere, as proven by some thirty-four years, at least, of a record of nonviolence.

In my view, the plaintiffs are completely right. I have asked the Government to come forward with any indication whatever of violent revolutionary activity or any other illegal activity carried out by the YSA or the SWP, and the Government has come forward with absolutely nothing.

I have asked the Government to provide any indication of any discussion of violence or illegal activity or any incitement of such activity involving any prior national convention of the YSA, this being the fourteenth such convention. The Government has come forward with nothing.

The Government's main reliance as far as any current problem or risk is concerned relates to a matter discussed at length this afternoon, which, again, I will not attempt to describe in detail.

Basically, I believe, it can be summarized thus:

There have developed in the SWP throughout the world certain factions, one of which adheres to what they consider the traditional and standard SWP doctrine of nonviolence. This is admitted to be the clear majority view, at least in the United States. There is another, minority view, which apparently managed to have passed at a meeting this year, an international meeting, a resolution approving the use of guerrilla warfare in Latin America. The meeting to which I refer is called the Tenth World Congress and was held in early 1974.

The representative of the majority of the United States party was opposed to the resolution backing the use of guerrilla force in Latin America and said that in his opinion it foreshadowed a more basic break, with more widespread geographical implications as far as the basic question of non-violence versus violence was concerned. However, the minority faction in the U.S. party, according to the representations made to me which I credit, which was in favor of the resolution about guerrilla warfare in Latin America, has been ousted from the SWP party in America as of July 1974.

There was never anything, in my view, beyond the most tenuous suggestion of a possible implication of violence in the United States.

In view of the ouster of the minority faction, I believe that tenuous suggestion has been basically eliminated.

It should be remembered that the SWP is a party with a membership of one thousand or two thousand and that in the last general election it obtained votes of about one hundred thousand.

The SWP and the YSA have come forward with materials which I find convincing regarding their current non-violent beliefs and their current disavowal of violence.

At the time of the assassination of President Kennedy, the national secretary of the SWP issued a press release condemning the assassination, condemning political terrorism and stating that political differences within our society must be settled in an orderly manner by majority decision after free and open public debate in which all points of view are heard.

The constitution of the SWP has nothing advocating violent, illegal activity. There is in the record a pamphlet written by one George Novack, entitled "Marxism versus Neo-Anarchistic Terrorism," which, despite what one may think of many of the beliefs stated therein, is nevertheless a most eloquent and intelligent statement of reasons against what is called individual terrorist activity.

I have questioned, on the basis of that pamphlet, what ultimate form of activity is contemplated and advocated by the SWP and the YSA, and I think it can be summed up as follows:

There is, indeed, in the pamphlet I have referred to and in other pieces of literature much of the rhetoric of revolution, that is, use of the term "revolution". There is talk about action of the masses and so forth, and it is clear that the ultimate, long-range goal of the SWP would be and it is stated to be the expropriation of the financial resources of this country from their present owners and the placing of such resources in the hands of the working class.

Why is not this the advocacy of revolution which would justify FBI surveillance at the meetings of this group? I do not believe there is such justification, and I believe that the revolutionary rhetoric must be taken in context in order to avoid a departure from reality.

The talk about the expropriation of power is right now a discussion of theory. There is not the slightest indication of any mass action or any other action to now or in the near future expropriate property by this party. The party obviously realizes that its small size now would make such a program ridiculous. They have expressed this in their own words, and what they are doing right now is to have discussions of socialism.

They are sponsoring and supporting causes which they believe in, such as the farm workers' activity in California, women's lib and so forth. The discussion of ultimate action by the masses is a theoretical discussion.

I have reviewed a recent issue of their publication called The Militant, which is quite a lengthy newspaper, and it is filled with the discussion of all manner of public issues, and there is in my view not the slightest hint of any present violent threat or any such threat for the near future. The newspaper is filled with discussions of candidates supported by the SWP for various offices throughout the country, discussions of school board problems in New York City and so forth and so on.

As a matter of policy, it seems to me, finally, that the healthy thing for our society to do is to permit this group to freely have their discussions of the issues which concern them and of their theories. It seems to me inevitable that as a result of those discussions at such conventions as are coming up, the theories will evolve and that it would be absurd to place any restrictions upon their exercise of First Amendment rights because of some theoretical goal long in the future, if ever, of the consummation of their avowed socialist program.

[4] For these reasons I find and conclude that the proposed FBI surveillance threatens a substantial impairment of the First Amendment rights of plaintiffs SWP and YSA and that the Government has shown no compelling interest and no other necessity of any other degree which would justify the impairment which I have described.

Since this is a preliminary injunction motion, the standard which I am to apply is an alternative standard, that is, a preliminary injunction is justified if the plaintiffs have shown a probability of success on the ultimate merits and a threat of irreparable injury; or a preliminary injunction is justified if there are serious and substantial questions regarding the merits of the action, and the hardships to the plaintiffs from not granting the injunction outweigh the hardships to the defendants in granting the injunction. I think the second of the alternative tests is the appropriate one.

It surely seems to me clear that the plaintiffs have raised serious questions and substantial questions about their right to First Amendment relief. Further, it seems to me that there is a showing of substantial harm to the upcoming convention and to the participants if the injunctive relief is not granted.

Finally, it seems to me clear that the Government has shown nothing in the way of a loss to its interests if the injunction is granted.

The plaintiffs should settle an order at the earliest opportunity.