In re the ATTORNEY GENERAL OF
the UNITED STATES,
Petitioner-Appellant.

SOCIALIST WORKERS PARTY et al.,
Plaintiffs-Appellees,

v.

The ATTORNEY GENERAL et al.,
Defendants-Appellants.

Nos. 239, 484, 485, Dockets 78–6114,
78–6179, 78–3050.

United States Court of Appeals,
Second Circuit.

Argued Nov. 15, 1978.

Decided March 19, 1979.

Robert B. Fiske, Jr., U.S. Atty. for the Southern District of New York, New York City (Thomas E. Moseley, Stuart I. Parker, Frank H. Wohl, Asst. U.S. Attys., New York City, of counsel), for defendants-appellants and petitioner-appellant.

Leonard B. Boudin, Rabinowitz, Boudin & Standard, New York City (Eric M. Lieberman, Rabinowitz, Boudin & Standard, Margaret Winter, Mary B. Pike, New York City, on the brief), for plaintiffs-appellees.

Eugene Gold, Dist. Atty., Kings County, Brooklyn, N.Y. (Richard E. Mischel, Asst. Dist. Atty., Brooklyn, N.Y., of counsel), National Dist. Attorneys Association, Inc., Chicago, Ill., amici curiae in support of petitioner-appellant and other defendants-appellants.

Before LUMBARD, FRIENDLY and OAKES, Circuit Judges.

OAKES, Circuit Judge:

The Government appeals from an order of the United States District Court for the Southern District of New York, Thomas P. Griesa, Judge, holding the Attorney General of the United States in civil contempt for refusing to release eighteen files disclosing the names of a number of allegedly confidential government informants to appellees' attorneys, in accordance with an order of the court. In the alternative the Government petitions for a writ of mandamus directing the district court to withdraw its order of contempt and its order directing release of the files. We hold the order nonappealable but, in view of the extraordinary circumstances and nature of the case, grant the petition for a writ of mandamus, vacate the contempt order, and direct the district court further to consider issue-related sanctions under Fed.R.Civ.P. 37(b)(2).

BACKGROUND

This case arises out of a complaint filed on July 18, 1973, by the Socialist Workers Party (SWP), its affiliate, the Young Socialist Alliance (YSA), and some individual members alleging that over several decades the Federal Bureau of Investigation (FBI) has engaged in an unlawful investigation of plaintiff organizations with the purpose of disrupting or destroying them. The Government concedes that the investigation included the use of informants; physical, photographic, and electronic surveillance; a mail cover in 1973; certain surreptitious entries; and a "counter-intelligence" or "disruption" plan. The complaint runs against the United States itself under the Federal Tort Claims Act, against several high public officers in their official capacities (including the Attorney General of the United States), and against former officers in their personal capacity (Richard M. Nix-on, John Mitchell, John W. Dean III, certain named FBI agents, and other unnamed government employees and agents). Discovery disclosed that the FBI made widespread use of paid informants to obtain information about plaintiffs' activities. Approximately 1,300 individuals provided confidential information to the FBI on more than one occasion, and 300 of them were members of the SWP or YSA.

When the scope of the informants' activities was uncovered and it was revealed that the FBI had falsely answered an interrogatory with respect to an individual informant's activities,[1] plaintiffs sought to obtain production of some of the informants' files themselves. Although the Government voluntarily furnished the files of seven informants whose identities had been disclosed, it refused to produce the files of nineteen informants whom plaintiffs had chosen as representative from the interrogatory answers. (The Government subsequently withdrew its objection as to one of these files when the informant's identity was disclosed.) The district judge personally conducted an *in camera* review of the extensive informant files in question, having secured detailed summaries from the Government to assist his evaluation.

On May 31, 1977, the court ordered the Government to make the FBI files and summaries regarding the eighteen undisclosed informants available *in camera* to four of plaintiffs' attorneys. The Government sought review of the order by appeal or mandamus, but this court denied review *In re United States,* 565 F.2d 19 (2d Cir. 1977), *cert. denied,* 436 U.S. 962, 98 S.Ct. 3082, 57 L.Ed.2d 1129 (1978) (*SWP II*).[2] The district court subsequently attempted to settle the disclosure issue by a proposal that the Government release nine files to the plaintiffs. The Government did not

1. When a member informant named Timothy Redfearn was arrested in July 1976 for a burglary, his undercover status became public. The Government released his file to plaintiffs, who then discovered that interrogatory answers as to his activities had failed to disclose that he had removed documents from SWP and YSA offices.

2. The first appellate decision in this lawsuit, *Socialist Workers Party v. Attorney General,* 510 F.2d 253 (2d Cir. 1974), *rev'g* 387 F.Supp. 747 (S.D.N.Y.), *stay denied,* 419 U.S. 1314, 95 S.Ct. 425, 42 L.Ed.2d 627 (Marshall, Circuit Justice), overturned the district judge's grant of a preliminary injunction restraining the FBI from monitoring a YSA national convention.

accept the proposal but did offer to release to the plaintiffs under a protective order the files of four informants who had consented to disclosure. When the Attorney General on his own authority under 5 U.S.C. § 301 and 28 C.F.R. §§ 16.23 and 16.24(b) determined not to comply with the disclosure order, the district court, rejecting alternative sanctions, first warned the Attorney General on June 30, 1978, that noncompliance would result in a civil contempt citation and then adjudged him in contempt on July 6, after he declared that he would refuse production. Judge Gurfein of this court stayed the contempt order on July 7, 1978, to permit the Attorney General to seek review of the contempt orders by a full panel of this court. Subsequent to the argument on this appeal the district court reconsidered, in light of *Birnbaum v. United States,* 588 F.2d 319 (2d Cir. 1978), the Government's motion to dismiss the complaint but denied the motion.

## APPEALABILITY

■ The Government contends that the contempt order is appealable as a collateral order, as a third party contempt, or as an exceptional order implicating the constitutional separation of powers. None of these contentions is persuasive.

The Government first maintains that the order is appealable under the so-called "collateral order" doctrine, a judicial gloss upon the statutory requirement of finality, 28 U.S.C. § 1291, created by *Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). But we have held that discovery orders are not appealable under this doctrine even where the appellant asserts a work product privilege. *American Express Warehousing, Ltd. v. Transamerica Insurance Co.,* 380 F.2d 277, 280–82 (2d Cir. 1967). And in *International Business Machines Corp. v. United States,* 493 F.2d 112 (2d Cir. 1973), *cert. denied,* 416 U.S. 995, 94 S.Ct. 2409, 40 L.Ed.2d 774 (1974) (IBM), at the Government's earnest urging, we followed *Fox v. Capital Co.,* 299 U.S. 105, 57 S.Ct. 57, 81 L.Ed. 67 (1936), and *Doyle v. London Guarantee & Accident Co.,* 204 U.S. 599, 27 S.Ct. 313, 51 L.Ed. 641 (1907), by holding that a party may not appeal a civil contempt order imposed for breach of a discovery order even where he had resisted discovery on the basis of the attorney-client work product privilege. Although this case involves the informant privilege [3] and although we stated in IBM that such a contempt order might be appealable in "certain extraordinary circumstances," 493 F.2d at 119, we do not retreat from the general standard there expressed.

The Government nevertheless argues that the contempt order here "falls within that narrow category of orders that can be considered separable from the main action and which are too important to be denied review," apparently because the order is directed against the Attorney General. We agree that this order is important, but we are as unpersuaded about its severability as we were in *IBM supra.* In *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978), the Supreme Court quite pointedly limited the collateral order doctrine to orders which "conclusively determine the disputed question, resolve an important issue *completely separate* from the merits of the action, and [are] effectively unreviewable on appeal from a final judgment." *Id.* at 98 S.Ct. at 2458 (emphasis added). *See also Weight Watchers of Philadelphia, Inc. v. Weight Watchers International, Inc.,* 455 F.2d 770, 772–74 (2d Cir. 1972). Notwithstanding the presence of the Attorney General as a party, here the issue of discovery is integral to, rather than "completely separate from," the merits of the action.

---

**3.** For a discussion of the role of the informant privilege in civil cases, *see generally In re United States,* 565 F.2d 19, 22 (2d Cir. 1977), *cert. denied,* 436 U.S. 962, 98 S.Ct. 3082, 57 L.Ed.2d 1129 (1978); *Usery v. Ritter,* 547 F.2d 528 (10th Cir. 1977); *Black v. Sheraton Corp.,* 47 F.R.D. 263 (D.D.C.1969) (Sirica, J.), *aff'd,* 184 U.S. App.D.C. 65, 564 F.2d 550 (1977). *See also Weatherford v. Bursey,* 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977); *Roviaro v. United States,* 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957); *United States v. Reynolds,* 345 U.S. 1, 12, 73 S.Ct. 528, 97 L.Ed. 727 (1953).

The Government also argues that the contempt order is reviewable as a third party contempt because the United States, not the Attorney General, is the real party in interest. We disagree. Although it is true that the present Attorney General is not named a defendant in his personal capacity,[4] he is named in his official capacity and is in no sense only a nominal or formal party. Any equitable relief granted would surely run against him in that capacity. Thus, cases permitting appeal by contemnors who were attorneys but not parties to the underlying action, e. g., *In re Murphy,* 560 F.2d 326 (8th Cir. 1977); *Appeal of United States Securities & Exchange Commission,* 226 F.2d 501, 520 (6th Cir. 1955), are simply inapposite.

The Government finally argues that this case comes within the very narrow exception to the finality rule recognized in *United States v. Nixon,* 418 U.S. 683, 690–92, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). In *Nixon,* the Court held that the President of the United States, a third party in a criminal proceeding, need not follow the traditional avenue of placing himself in contempt to obtain review of an order denying his motion to quash and requiring him to produce evidence pursuant to a subpoena duces tecum. To require the President to take that route "would be unseemly, and would present an unnecessary occasion for constitutional confrontation between two branches of the Government." *Id.* at 691–92, 94 S.Ct. at 3099. But *Nixon* is readily distinguishable from this case. *Nixon* did not involve, as this case does, a suit against the United States in which a party (here, the Attorney General) was asserting a privilege. Review was more appropriate in *Nixon* because the assertion of a privilege

simply deflected the search for truth in a separate criminal action and did not present an obstacle to a lawsuit directly challenging government conduct. Moreover, in *Nixon* the President claimed a privilege as to his *personal* papers. Here the Attorney General seeks to protect from disclosure official records that he holds or has under supervision in his official capacity only. Finally, and most important, the executive responsibilities and constitutional status of the Attorney General do not compare to those of the President.[5] The Attorney General has no greater statutory authority over his department's official records than does any other Cabinet officer.[6] Since the earliest days of this nation, courts have declined to accord to Cabinet or other executive officials the same prerogatives that they accord to the President himself. *See Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 165–66, 170–71, 2 L.Ed. 60 (1803); *Sawyer v. Dollar,* 89 U.S.App.D.C. 38, 48–49, 53–54, 190 F.2d 623, 633–34, 638–39 (1951), *vacated as moot,* 344 U.S. 806, 73 S.Ct. 7, 97 L.Ed. 628 (1952); *Bank Line, Ltd. v. United States,* 163 F.2d 133, 138 (2d Cir. 1947) (Augustus N. Hand, J.) ("It has been the policy of the American as well as of the English courts to treat the government when appearing as a litigant like any private individual. Any other practice would strike at the personal responsibility of governmental agencies which is at the base of our institutions.")

## MANDAMUS

We turn, then, to the question whether we should review the contempt order by issuing a so-called "extraordinary" writ—here, the writ of mandamus, 28

---

4. The complaint also names a former Attorney General in his personal capacity.

5. The opinion in *Nixon* clearly relied on the unique constitutional role of the Presidency. *United States v. Nixon,* 418 U.S. 683, 691–92, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). *See also Mississippi v. Johnson,* 71 U.S. (4 Wall.) 475, 500–501, 18 L.Ed. 437 (1867).

6. 5 U.S.C. § 301 provides:

The head of an Executive department or military department may prescribe regulations for the government of his department, the conduct of its employees, the distribution and performance of its business, and the custody, use, and preservation of its records, papers, and property. This section does not authorize withholding information from the public or limiting the availability of records to the public.

U.S.C. § 1651(a).[7] We commence with the ready acknowledgment that only the truly exceptional case warrants this exercise of supervisory control. "[T]he touchstones . . . are usurpation of power, clear abuse of discretion and the presence of an issue of first impression." *American Express Warehousing, supra,* 380 F.2d at 283. The Supreme Court has interpreted the standard for issuance of the writ more liberally in some cases than in others. *Compare Schlagenhauf v. Holder,* 379 U.S. 104, 85 S.Ct. 234, 13 L.Ed.2d 152 (1964), and *LaBuy v. Howes Leather Co.,* 352 U.S. 249, 258–60, 77 S.Ct. 309, 1 L.Ed.2d 290 (1957), *with Will v. United States,* 389 U.S. 90, 88 S.Ct. 269, 19 L.Ed.2d 305 (1967). *See* Note, *Supervisory and Advisory Mandamus under the All Writs Act,* 86 Harv.L.Rev. 595 (1973). In the Supreme Court's most recent discussion of the subject, the plurality emphasizes that the moving party must show a "clear and indisputable" right to the writ, *Will v. Calvert Fire Insurance Co.,* 437 U.S. 655, 98 S.Ct. 2552, 57 L.Ed.2d 504 (1978); this admonition would, however, be more significant if a majority of the Court had endorsed it. Finally, we note that this court has been more reluctant than some courts [8] to exercise freely the supervisory or advisory power to issue writs of mandamus. *National Super Spuds, Inc. v. New York Mercantile Exchange,* 591 F.2d 174, 181 (2d Cir. 1979); *Kaufman v. Edelstein,* 539 F.2d 811, 816–19 (2d Cir. 1976).

In *American Express Warehousing, supra,* however, we pointed out:

> When a discovery question is of extraordinary significance or there is extreme need for reversal of the district court's mandate before the case goes to judgment, there are escape hatches from the finality rule: a certification by the district court under 28 U.S.C. § 1292(b) . . . or an extraordinary writ.

*Id.* at 282. Two other cases, not mentioned by the parties, illuminate the meaning of "extraordinary significance" and "extreme need for reversal." In *Investment Properties International, Ltd. v. IOS, Ltd.,* 459 F.2d 705, 707 (2d Cir. 1972), we granted a writ of mandamus requiring the district court to permit plaintiffs to depose defendants' officers in order to establish standing and subject-matter jurisdiction because we viewed such discovery as "the heart of the controversy." In *United States v. United States District Court,* 444 F.2d 651 (6th Cir. 1971) (Edwards, J.), *aff'd,* 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972), the court granted the writ in connection with a suppression hearing in a pending criminal trial to determine whether the Attorney General could resist disclosure of information that he had obtained as a result of authorized warrantless wiretapping in an internal security matter. Because it was "an extraordinary case" in which "[g]reat issues are at stake for all parties concerned," because the Government asserted that the order was illegal, and because the case posed a "basic issue which has never been decided at the appellate level by any court," the Sixth Circuit took jurisdiction, even though it ultimately upheld the ruling of the district court.[9]

This too is an extraordinary case. *See Ex parte Fahey,* 332 U.S. 258, 260, 67 S.Ct. 1558, 91 L.Ed. 2041 (1947). It is, so far as we know, the first case brought by a political party [10] against the Government itself for damages as well as injunctive relief for allegedly illegal surveillance of that party. The plaintiffs contend that the FBI used

---

7. 28 U.S.C. § 1651(a) provides:

 The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.

8. *E. g., Colonial Times, Inc. v. Gasch,* 166 U.S. App.D.C. 184, 509 F.2d 517 (1975).

9. In affirming the decision of the court of appeals, the Supreme Court, without discussion, expressed agreement with the court of appeals' holding that it had jurisdiction to issue the writ of mandamus. *United States v. United States District Court,* 407 U.S. 297, 301 n.3, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972).

10. Two of the plaintiffs here are political parties, the Socialist Workers Party and the Young Socialist Alliance.

informants to disrupt the party by means of illegal break-ins, wiretaps, mail openings, and various other conversions, trespasses, and illegal acts, and thus that they seek information "at the heart of the matter." The suit also asserts that high executive officials are personally liable for some of these acts.

The case also involves a claim of privilege on behalf of an unprecedented number of informants—over 1,300 according to the Government's brief, of whom approximately 300 served as members and 60 as officeholders of plaintiffs. This claim of privilege includes the larger claim, to which Attorney General Griffin Bell has attested,[11] that the failure to recognize the privilege would adversely affect the entire law enforcement and intelligence-gathering apparatus of the United States. The importance of this privilege was emphasized in the previous decision of this court which warned against disclosure for which there is no substantial need. *SWP II, supra,* 565 F.2d at 23. Noting that "[w]e are far from convinced that plaintiffs' attorneys require a wholesale disclosure of informants' identities in order to prepare their case for trial," the court said:

> As this Court stated when this case was before it on a prior appeal, the district court should weigh "the serious prejudice to the Government from compromising some or all the informants for all time, even though the final determination of the action may be for the defendants."

*Socialist Workers Party v. Attorney General,* 510 F.2d 253, 257 (2d Cir. 1974). *Id.* at 24.

■ This case is unusually important for another reason—because the order for which review is sought adjudged the Attorney General of the United States in civil contempt. Although we unequivocally affirm the principle that no person is above the law, and although we do not find petitioner's status as chief law enforcement officer sufficient to permit an appeal under the *Nixon* exception, we cannot ignore the fact that a contempt sanction imposed on the Attorney General in his official capacity has greater public importance, with separation of power overtones, and warrants more sensitive judicial scrutiny than such a sanction imposed on an ordinary litigant. We do not, of course, hold that mandamus is always appropriate to review a contempt order against the Attorney General, but we do think that this factor is entitled to some weight.[12]

■ In light of the underlying issues of first impression; a question of the informant privilege that involves "a vital interest" of the United States, according to the Attorney General; and the seriousness of a contempt citation against the Attorney General in his official capacity, we have the "extraordinary significance" that *American Express Warehousing supra,* 380 F.2d at 282–83, requires for the issuance of a writ of mandamus.

---

11. Releasing these eighteen files to plaintiffs' counsel would have a significantly detrimental effect on law enforcement by undermining the pledge of confidentiality which the FBI makes to informants, which pledge its agents made in this case. Such action would signal to other informants and potential informants that the United States would not or could not continue to honor the pledge of confidentiality which has been the cornerstone of its relationship with informants, thereby adversely affecting the ability of other law enforcement agencies, such as the Internal Revenue Service, the Drug Enforcement Administration, the Secret Service, the Postal Inspection Service, the Bureau of Alcohol, Tobacco and Firearms, the Immigration and Naturalization Service, the Securities and Exchange Commission and the Department of Labor, to attract and maintain sources of

information. Release of these names here and in other cases under similar circumstances would also tend to deter potential and actual foreign counterintelligence informants from cooperating with the United States. The resulting diminution of information and the effect on law enforcement and foreign counterintelligence would, in my judgment, be substantial.
Affidavit of Griffin B. Bell, June 13, 1978, ¶ 5.

12. We note in passing that the order before the *SWP II* court was directed to the FBI. The claim of privilege was asserted by affidavit and testimony of James B. Adams, an Assistant to the Director-Deputy Associate Director (Investigation) of the FBI. The Attorney General interposed himself in the disclosure controversy after the *SWP II* decision.

## THE MERITS

 We begin our analysis of the merits by stressing two considerations. The first is the nature of the contempt power itself. Just as, we trust, an Attorney General would not lightly invoke a privilege such as the one that he invokes here, so too the court must not lightly invoke its contempt power. For the exercise of that power is, even in the context of a private attorney, "awesome in its implications." *United States v. Wendy,* 575 F.2d 1025, 1030 (2d Cir. 1978). Second, in an extraordinary case such as this, the significance of abuse of discretion is magnified. *United States v. United States District Court, supra,* is an excellent illustration: the issue was so important that mandamus was granted to *affirm* the lower court. Here, as noted above, the contemnor is not simply an attorney but the chief law enforcement officer of the nation, a public official who exercises powers entrusted to him by both the executive and legislative [13] branches, with obligations to the judicial branch, and who is the principal attorney for another branch of government coequal to the judicial branch in constitutional function and design. Courts accordingly owe him respect as an official and, absent an abuse of power or misuse of office, the most careful and reasoned treatment as party or as litigant. Thus, holding the Attorney General of the United States in contempt to ensure compliance with a court order should be a last resort, to be undertaken only after all other means to achieve the ends legitimately sought by the court have been exhausted.

Judged by these standards, the action of the trial court unfortunately falls short, for in our view the court insufficiently considered issue-related sanctions. The Federal Rules of Civil Procedure permit many sanctions other than contempt alternatives that the court did not sufficiently explore except to reject the Government's proposals.

Under Fed.R.Civ.P. 37(b)(2), the sanctions for noncompliance with a discovery order include: (1) an order that "designated facts shall be taken to be established"; (2) an order "refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting him from introducing designated matters in evidence"; and (3) an order "striking out pleadings or parts thereof . . . or rendering a judgment by default." [14]

---

**13.** For example, only the Attorney General or his designee may authorize an application for a wiretap order under 18 U.S.C. § 2516. *See United States v. Giordano,* 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974).

**14.** Fed.R.Civ.P. 37(b)(2) provides in full:

(2) *Sanctions by court in which action is pending.* If a party or an officer, director, or managing agent of a party or a person designated under Rule 30(b)(6) or 31(a) to testify on behalf of a party fails to obey an order to provide or permit discovery, including an order made under subdivision (a) of this rule or Rule 35, the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following:

(A) An order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order;

(B) An order refusing *to* allow *the* disobedient party to support or oppose designated claims or defenses, or prohibiting him from introducing designated matters in evidence;

(C) An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party;

(D) In lieu of any of the foregoing orders or in addition thereto, an order treating as a contempt of court the failure to obey any orders except an order to submit to a physical or mental examination;

(E) Where a party has failed to comply with an order under Rule 35(a) requiring him to produce another for examination, such orders as are listed in paragraphs (A), (B), and (C) of this subdivision, unless the party failing to comply shows that he is unable to *produce such person for examination.*

In lieu of any of the foregoing orders or in addition thereto, the court shall require the party failing to obey the order or the attorney advising him or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the court finds that the failure was substantially justified or that oth-

There are, of course, limitations upon the Rule 37 sanctions that may be imposed against the Government. These include the following: (1) punitive damages may not be awarded against the United States, 28 U.S.C. § 2674; (2) expenses and attorney's fees may not ordinarily be imposed against the United States, Fed.R. Civ.P. 37(f); (3) only actual or nominal damages can be recovered against the United States for deprivation of constitutional rights, see *Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978); (4) due process requires that the most severe sanctions of dismissal or default be imposed only if the failure to comply is due to willfulness, bad faith, or fault, and not to an inability to comply. *See Societe Internationale v. Rogers,* 357 U.S. 197, 209, 212, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958); *Flaks v. Koegel,* 504 F.2d 702 (2d Cir. 1974).[15]

The Government suggested three options to contempt below. First, it proposed that plaintiffs be allowed to "establish from facts within their knowledge" the amount of damages at each SWP and YSA chapter and be given the benefit of a presumption that such damages were the result of informant activity. The Government would have the burden of proving either that there were no damages or that there was an alternative cause for the loss. Second, the Government suggested that plaintiffs go forward with "full discovery" based on the twelve[16] informant files now available to them and present to the court a kind of test case of injury and damages so that the court could determine the extent to which information in the files was necessary to determine the amount of actual damages. Third, if neither of these sanctions were appropriate, the court and counsel should devise some other issue-related sanction.

Judge Griesa rejected the first of these proposals because it would leave plaintiffs in an impossible position. Without a representative sample of the detailed evidence in the informant files, and some reasonable summarization of the other informant file evidence, plaintiffs are deprived of the most important source of evidence needed by them both to develop the full nature of the wrongdoings and damages, and to rebut Government defense evidence.

And as to the second proposal for sanctions, Judge Griesa thought that the twelve files that the Government was willing to produce "do not constitute a fair selection";[17] he characterized the proposal as "simply a renewed effort to whittle down plaintiffs' already modest, compromise request for documents."

The court also concluded that any other sanction would be unproductive and would only result in delay. The court had previously stated that the informant files evidence was "so basic and essential that no major issue in the case—whether relating to injunctive relief, claims for damages, or jurisdictional defenses—can be resolved without developing a factual record with evidence from these files."[18]

er circumstances make an award of expenses unjust.

**15.** It might appear that a partial default judgment cannot be entered against the United States, for Fed.R.Civ.P. 55(e) provides that "[n]o judgment by default shall be entered against the United States or an officer or agency thereof unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." The Government concedes, however, that this limitation does not bar a partial final judgment. Gov't Brief at 120*. As one commentator has noted, a court might, notwithstanding Rule 55(e), treat as admitted those facts that the litigant would have had to prove by means of the evidence that the Government would have produced if it had complied with discovery. 10 C. Wright & A.

Miller, *Federal Practice and Procedure* § 2702, at 358 (1973). Such a procedure might well have the same effect as a partial default judgment.

**16.** As noted above, the Government has already produced eight files and has said it is willing to produce, subject to certain deletions, four of the eighteen here in question.

**17.** The court said that the 12 files "do not cover the range of locations and activities embraced in the total number of files ordered to be produced by the Court."

**18.** We note that the district court's decision, which was dated June 30, 1978, does not take into account the general suggestion in Attorney

After our independent review of the eighteen informant files summaries, we conclude that it was clearly erroneous for the district court to determine that the files are so central to the plaintiffs' case that contempt is the only appropriate sanction for the Government's failure to disclose them. Because that determination is erroneous, the district court has an obligation to investigate more thoroughly than it has to date reasonable alternative sanctions to contempt. Our conclusion that the court abused its discretion thus requires, in this unusual case, the grant of the extraordinary writ of mandamus.

### MANDATE

In effectuating this court's mandate to consider alternative sanctions, the district court should of course impose those sanctions which, so far as possible, put plaintiffs in the position that they would have been in if the Government had disclosed the information. We recognize that the task of fashioning such a sanction will not be easy. But we believe that much of the difficulty of creating a feasible and equitable sanction will be avoided if the district court produces a set of representative findings from the informant files for the benefit of the plaintiffs. Of course, this alternative might not itself be a sufficient sanction for the Government's noncompliance with the discovery order. The information supplied by such findings will nevertheless help the plaintiffs in two ways: by improving their ability to prosecute the action without the files and by improving their ability to identify the damages that they have suffered and to demonstrate what further sanctions, if any, are appropriate. The court should frame its findings with these two purposes in mind.

We have reviewed in depth the summaries of the informants' files in question, and it is our view that the district court, or a

master under its direction, can feasibly make representative findings that would supply the plaintiffs with much of the information that they need to establish their claims or to propose other sensible sanctions, if any are needed, without compromising the identity of the informants. We do not, of course, purport to anticipate the precise content of those findings. The district court should not consider exhaustive the sample findings that we suggest and should include only findings relevant to plaintiff's case. Indeed, the judge's own discussion of the summaries in open court on April 14, 1977, and June 22, 1977, reproduced in the Appendix on Appeal at 842–60, 209–10, if reduced to more detailed formal findings, would go a long way toward satisfying this court's mandate.

We have attached as an appendix to this opinion a "suggested form of representative findings," the headings of which follow those in the summaries of the informant files submitted to this court by the Government. Although most of the findings may be framed in general terms, findings with respect to disruptive or illegal activity should be as specific as possible without disclosing the identity of the informant. In particular, such findings should detail to the extent possible the nature and extent of the damage that the plaintiffs may have suffered as a result of the informant activity.

The representative findings might follow the form of the summaries themselves. The findings can usually be based upon the summaries alone. If the summary's description of an important matter is too vague or incomplete, however, the district court or master may refer to the original informant file. In other words, the court may provide plaintiffs with what the court itself suggested was missing—a "representative sample of the detailed evidence in the informant files."[19] We agree with the dis-

---

General Bell's affidavit of June 13, 1978, that appropriate sanctions would be as set forth in Rule 37(b)(2)(A)–(C), that is, "concessions of certain facts or legal issues, or partial judgment in plaintiffs' favor."

**19.** The district court also spoke of the need for "some reasonable summarization of the other informant file evidence." The purpose of the representative findings that we have outlined here, however, is only to aid the district court

trict court's evaluation that much of this evidence follows a standard pattern.[20] And we think that the court can prepare these findings without disclosing the identities of the informants;[21] as the district judge said, with respect to providing information relating to all the informant files:

> I think that the chances are very great that this can be done without any substantial revelation of the identity of the informants because I am now reasonably convinced that the identity of the individuals in all, virtually all, cases would be almost useless to me as a judge or to the parties to the litigation.

We grant the petition for a writ of mandamus, vacate the contempt order, and direct the district court to impose such issue-related sanctions as are consistent with this opinion and otherwise proper. Despite the Government's request, we decline to examine the underlying disclosure order. Apart from the question whether we have jurisdiction to review at this time that order,[22] we believe that review is not wise because we have not held that contempt is an appropriate sanction for noncompliance with the order.

Judgment in accordance with opinion: jurisdiction retained.

## APPENDIX

*Suggested form of representative findings*

1. *Background information.*

The 18 files cover informant activity in _____ cities, ranging from small to large in size. The cities included _____, _____

[Note: delete name of city if number of members is so small that informants would be identifiable.].

2. *Method of recruitment.*

_____ of the _____ informants described in these files volunteered to become informants; _____ were actively recruited by the FBI.

3. *Confidential relationship with the FBI.*

_____ were advised by the FBI in writing, and _____ orally, that the FBI would never disclose their identities. _____ signed statements agreeing to keep their relationship with the FBI and their information confidential.

4. *Organizations with which informants were affiliated.*

_____ of the informants were members of the SWP only; _____ were also members of other organizations.

Some informants belonged to as many as _____ organizations and reported on as many as _____.

5. *Informants' relationship with the SWP and their method of obtaining information.*

In _____ cases, informants obtained non-public information from the SWP or its members in an undisclosed manner. In _____ of these cases, the informants held positions with the SWP that might have permitted them to obtain this information by non-surreptitious means. Informants

---

in choosing an appropriate sanction for the Government's nondisclosure of the 18 files. Consequently the findings need only extend to those 18 files.

20. The district court on April 14, 1977, noted, "What I am getting at, the pattern of the activity, it seems to me, within limits, is somewhat standard." The court went on to say, however, "Where does that leave any issue in the case? It seems to me that there still is an issue as to the degree, the extent, the comprehensiveness of the use of informants." We think that the findings can also state whether there was an FBI "plan" and, if so, its extent and comprehensiveness.

21. Disclosing information without disclosing identities will require a sensitive formulation of findings. In particular, the courts should be careful that separate findings, except where absolutely necessary to development of quintessential information, do not give enough cumulative information about an informant to permit his identification, even though the findings considered separately protect his identity.

22. *Compare Garland v. Torre,* 259 F.2d 545, 550 n. 11 (2d Cir.), *cert. denied,* 358 U.S. 910, 79 S.Ct. 237, 3 L.Ed.2d 231 (1958), *with Maggio v. Zeitz,* 333 U.S. 56, 68–69, 68 S.Ct. 401, 92 L.Ed. 476 (1948).

\# _____, _____, however, did not have potential access by virtue of their positions.

Informants had the following positions with the SWP, for the following periods:

Informant # _____: _____

Informant # _____: _____
etc.

## 6. Activities.

### A. Topics reported on at meetings:

The informants' reports about SWP described the following topics, among others: specific political issues of current interest; local fund-raising and organizational plans; election campaigns; _____; _____.

The reports indicate that many informants attended meetings regularly and gave weekly reports. For example, Informant # 306 attended and/or reported on approximately 1300 meetings and activities of New Left organizations over a 13-year period.

Discussion of the Fourth International was limited to _____.

There was [no/some] discussion of disruptive or violent activity during the SWP meetings.

### B. Other activities that source reported:

Among the unusual activities that the sources reported are the following—

Informant # 306 attended an SDS workshop on explosives;

_____;

_____.

### C. Reports concerning personal information:

Reports of some informants also contained personal information about members, such as information about health, employment status, travel plans, social contacts, sexual relationships, and personal habits.

Informant _____ reported that _____.

The Bureau instructed _____ informants to gather personal information with respect to the following matters and in the following manner: _____.

### D. The obtaining or copying of documents or other items:

_____ of the informants had access to nonpublic documents by virtue of their official position.

Informants forwarded to the Bureau pamphlets, SWP reports and publications, internal correspondence between SWP officials, and _____.

Informant # 1121 voluntarily provided trash to the Bureau by virtue of his position as janitor. The trash contained minutes, correspondence about SWP affairs, membership lists, financial records, and _____. FBI headquarters advised the local Bureau office that his "trash cover" could not be used, but before the informant could be approved on this basis, he resigned.

### E. Counterintelligence program (COINTELPRO):

_____ of the files mention COINTELPRO activity, and _____ mention involvement in the SWP disruption program.

The following specific instances are mentioned:

[Describe conduct and file number]

### F. Informants' participation in organizations:

_____ informants acted as photographers.

_____ voted in secret elections for SWP officers.

Informants also hosted meetings, assisted in mailings, engaged in leafletting and fund-raising, _____, _____.

### G. Comments by the FBI concerning informants:

[Discuss FBI rating system and any unusual reports.]

### H. Cooperation with other investigative agencies:

_____ of the informants cooperated with other federal investigative agencies, includ-

ing _____; _____ cooperated with other state investigative agencies, including _____.

### I. *Miscellaneous activities:*

Informant # 73 provided a report that was useful in a security of government employees investigation. He also advised the Bureau that the local SWP does not have any real influence within the NAACP.

Informant # 306 reported that certain FBI employees were associated with an anti-war organization. Their supervisor asked them to resign; some did. The anti-war organization planned a press conference to embarrass the FBI.

The same informant provided the names of individuals who contacted the SWP at the national headquarters in New York City requesting information about the SWP.

Other informants reported _____.

### 7. *Compensation.*

_____ of the informants were paid. Rates ranged from _____ [monthly/weekly] to _____ [monthly/weekly].

### 8. *Willingness to testify.*

_____ informants have expressed their willingness to testify in open court or before an administrative hearing board.

_____ informants have advised that they are unwilling so to testify.

### 9. *General findings.*

[Give a general characterization of the scope, extent, and comprehensiveness of the FBI's infiltration of the SWP; discuss whether the evidence suggests an overall FBI plan; and, if so, describe the nature of the plan. *See* Appendix on Appeal 852–57.]