**Carmelo DeCRESCENZO and Virginia DeCrescenzo, Appellants,**

v.

**MAERSK CONTAINER SERVICE COMPANY, INC., Appellee.**

**No. 1216, Docket 84–7010.**

United States Court of Appeals, Second Circuit.

Argued May 10, 1984.

Decided Aug. 3, 1984.

Richard J. Cardali, New York City (Robert J. Smith, New York City, of counsel), for appellants.

Marshall M. Kolba, New York City (Alexander, Ash, Schwartz & Cohen, P.C., New York City, of counsel), for appellee.

Before OAKES and VAN GRAAFEILAND, Circuit Judges, and BONSAL, District Judge.*

OAKES, Circuit Judge:

This appeal is from the grant of a dismissal of a personal injury case as a sanction under Fed.R.Civ.P. 37(b) for a supposed failure to comply with an order requiring the plaintiff to submit to a physical examination under Fed.R.Civ.P. 35. While the United States District Court for the Southern District of New York, Robert L. Carter, Judge, is clearly authorized by law to dismiss a case for failure to comply with discovery orders, *see* Fed.R.Civ.P. 37(b)(2)(C), we believe the "extreme" sanction of dismissal, *Cine Forty-Second Street Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062, 1064 (2d Cir. 1979), too drastic under the facts of this case at this time, and we therefore reverse. *See Societe Internationale Pour Participations Industrielles et Commerciales v. Rogers*, 357 U.S. 197, 209, 212, 78 S.Ct. 1087, 1094, 1095, 2 L.Ed.2d 1255 (1958); *Flaks v. Koegel*, 504 F.2d 702 (2d Cir.1974); *cf. In re Attorney General of United States*, 596 F.2d 58, 65–66 (2d Cir.) (issue-related sanctions to be considered prior to holding United States Attorney General in contempt), *cert. denied*, 444 U.S. 903, 100 S.Ct. 217, 62 L.Ed.2d 141 (1979).

## FACTS

Appellant Carmelo DeCrescenzo's alleged injury involves the "crushing" of his left foot by a mobile compressor at the appellee's pier in June of 1980. The crushing is said to have resulted in a host of medical problems, including the fracturing of the tibial aspect of the first metatarsal of the left foot, swelling, shininess of the skin, non-pitting edema, marked sensitivity of the skin, burning sensation, erythema and pain in the foot on walking and at rest, typical of a "Sudeck's atrophy," according to one doctor; severe sensitivity and inability to bear weight, diffuse edema, diffuse osteoporosis of the foot and ankle, a "re-

---

* Of the Southern District of New York, sitting by designation.

flex sympathetic dystrophy"[1] and possible causalgia syndrome, according to a second doctor; and "painful ankleosis" as well as sympathetic dystrophy, according to a third. X-rays referred to in a subsequent medical report revealed extensive patchy osteoporosis, suggesting disuse or immobilization of the foot, plus evidence of degenerative and possibly post-traumatic arthritis.[2] Yet another doctor, however, after noting that appellant refused to have a paravertebral block and that appellant's pain was "so severe that it [did] not permit any contact with the foot from the ankle down," concluded that the symptoms were mainly due to disuse and that the "clinical picture is not clearly that of a reflex sympathetic dystrophy." Another examining physician noted "voluntary guarding" by appellant of the foot, stated that appellant permitted touching of the foot only once and concluded that there was neither causalgia nor Sudeck's atrophy and probably not even a fracture of the metatarsal. An additional doctor found no causalgia and believed appellant possessed the orthopedic

ability to return to work. An eighth doctor, Dr. Jahss, examined appellant at appellee's request and noted no swelling or discoloration. According to Dr. Jahss' report, the patient would not allow him to examine, "much less touch" the left foot.[3]

Appellee, believing the Jahss examination insufficient, then filed a Fed.R.Civ.P. 35 motion for an order compelling an additional physical examination. Despite appellant's declaration in his opposition affidavit that "the severe burning pain ... becomes increasingly severe when the foot is agitated, stroked and contacted," and that it was this pain that prohibited further cooperation with Dr. Jahss, the court granted the Rule 35 motion.

After one appointment with appellee's examining physician, Dr. Olson, was cancelled by appellant, appellee filed a dismissal motion under Rule 37(b); this motion was denied by Judge Carter, and by agreement of the parties a second appointment with Dr. Olson was made and kept. Following this examination the doctor made a

1. Reflex sympathetic dystrophy has been known for over one hundred years but is still poorly understood. An early description of the symptoms was published by Weir Mitchell, based on his experience with wounds of the extremities during the Civil War, but it has been described since then by many clinicians and is known under different names depending on the presenting or primary symptoms. A few examples of these syndromes which fall under this general category are causalgia, the name used by Mitchell to describe the burning pain of partial nerve injury; Sudeck's atrophy, the name used to describe the muscle atrophy and decalcification of bone that occurs following soft tissue and bone injuries of the extremities.... Although the most severe syndromes are seen with partial lesions of peripheral nerves, all these syndromes have similar changes apparently related to altered control of sympathetic innervation, and all respond in varying degrees to blocking the function of the sympathetic nervous system with local anesthetics or by surgical means.

In peripheral nerve lesions, the syndrome is seen most commonly with incomplete lesions of the median, ulnar and sciatic nerves, with preservation of pain function, but decrease in touch and pressure sensation distal to the lesion. *The patient usually complains that any stimulus, particularly light touch, causes a burning over the distribution of the area of*

*injury, which gradually spreads to involve the whole extremity. The pain often is so intense that the patient will spend hours keeping the hand or other involved part moist and protected from any contact or stimulus.* On examination, the major changes are increased sweating, vasoconstriction, smoothness (atrophy) of the skin, and marked limitation of all joint movement. With lesions of joints or soft tissue, such as bursitis of the shoulder, fractures of the wrist, or fractures of the small bones of the hand, the same syndrome may appear with less severity. In all instances, if the syndrome continues long enough, x ray shows decalcification and physical examination reveals swelling, smoothness of skin, vasomotor constriction, increased sweating, limitation of movement of joints, and eventually atrophy of muscles. Diagnosis is confirmed and therapy best commenced by sympathetic block with a local anesthetic. C. MacBryde & R. Blacklow, *Signs & Symptoms* 249–50 (5th ed.) (emphasis supplied).

2. All these are reported in more detail in Letter from Ralph A. Olson, M.D., a neurosurgeon, to Marshall M. Kolby, defense counsel (Oct. 10, 1983).

3. These reports are also detailed in Dr. Olson's letter, *supra* note 2.

seven page report, which, after reciting the medical history, the findings of the eight doctors previously referred to and the patient's treating physician, described Dr. Olson's own examination [4] and concluded:

It is my neurosurgical opinion following this examination that there are none of the criteria present which would indicate that the patient has any evidence of a reflex dystrophy or causalgia. None of the sympathetic changes associated with this condition are in evidence. Further, there is a large element of conscious dramatization of his subjective complaint in the respect that his sensory demarcation of increased sensitivity is of a stocking-type distribution and not consistent with an organic lesion. Further, although he does not allow the foot to be examined or touch [sic] them, further indicating a large conscious element of dramatization. It is obvious that his left foot is kept in a state of good hygiene; it was normally clean and the nails were normally trimmed—not found in conditions of causalgia or reflex dystrophy. It is clear that the left lower extremity is utilized to a great extent since in fact the left thigh was larger than the right, and there was no atrophy in the left calf, further indicating theatricality on the part of the patient.

I note no significant findings in the left foot to indicate any neurologic involvement.

In other words, Doctor Olson found no reflex dystrophy or causalgia. What he did find was "theatricality," *i.e.*, classic malingering—from the defendant's point of view the best possible report one could obtain.

Despite this extremely favorable report, appellee renewed its dismissal motion, requesting as an "alternative" to dismissal the equally severe sanction of precluding appellant from offering any evidence with respect to the claim of injury and damage. Despite opposition papers filed by appellant, including that of a paralegal who observed Dr. Olson's examination, and who disputed the doctor's assertion that appellant "was able to remove his socks and trousers and replacing [sic] them" (the paralegal said he assisted DeCrescenzo), the district court granted the motion to dismiss. Its reasoning was as follows:

On a prior occasion, plaintiff refused to allow defendant's physician to examine his foot. Defendant moved to compel plaintiff to submit to physical examination, that motion was granted, and some nine months later, arrangements were made a second time for the examination. This time plaintiff did not appear. Defendant's motion for sanctions was denied, and plaintiff was given a third opportunity to submit to the examination. On October 6, 1983, defendant's physician examined plaintiff in the office of plaintiff's counsel who was present

---

4. The patient arrived utilizing crutches and was wearing a sock over his left foot, favoring the left lower extremity. He was obviously overweight. Trousers were removed with the pants leg pulled over the left foot and the sock subsequently removed. At that point the patient would not allow me to touch his foot stating that it was extremely uncomfortable. He thereafter put one crutch beneath his foot propping it up six inches from the floor. Inspection of the foot revealed no sympathetic changes. There was no glossiness of the skin, no sympathetic changes of the nail bed, no evident swelling, discoloration or sweating. It was of interest that the nail beds were trimmed normally. The right thigh measured 21", six inches above the patella and the left thigh, 21⅝". This was repeated to insure that there was no atrophy of the left leg. Calves measured 16" bilaterally. When attempting

to measure the foot, the patient refused. He would allow no motor testing of the left foot, although it was noted that quadruceps [sic] and hamstrings were normally intact. On sensory testing, he allowed no pinprick to be applied to the left foot; however, on one occasion I touched a brush to his left foot and he complained of pain. Therefore, pinprick was applied to the left lower extremity above the ankle and carried inferiorly to a point just at the ankle and serial testing revealed a well demarcated area encircling the ankle of the left foot. Light touch was similarly defined and consistent with a sock-like distribution. Deep tendon reflexes were intact and equal throughout except in the left ankle which was not tested. The Babinski sign on the right was not present.
Excerpt from Dr. Olson's letter, *supra* note 2.

throughout. Plaintiff refused to allow the doctor to touch his foot because it was too painful. He would not allow his foot to be measured and refused to permit any motor testing or pin pricking of the foot. On one occasion the doctor touched a brush to the left foot, and the plaintiff complained of pain.

There is no essential dispute about what took place. Counsel for plaintiff contends that plaintiff did not refuse to be examined. He merely refused to submit to pain. Such sophistry is no defense.

Plaintiff has been given three opportunities to allow defendant to examine his foot and thus avoid having his claim dismissed for his failure to permit proper discovery by defendant. Plaintiff, however, persists in refusing to cooperate, and three opportunities are enough.

This appeal followed.

## DISCUSSION

The ultimate medical issue in this case is, of course, whether the plaintiff sustained "serious and severe personal injuries," as he claims, or whether he is malingering, as Dr. Olson's report indicates. If he has the conditions that he claims he has, such as reflex sympathetic dystrophy, Sudeck's atrophy and causalgia, it is understandable that he is not anxious to have his foot touched, much less manipulated, by examining physicians. See supra note 1. If he does not, on the other hand, suffer from those conditions, he should, of course, permit whatever touching or manipulation is required or requested by the examining physician. We do not, however, believe that the lower court took into account the possibility, as indicated in some of the doctor's reports, that appellant does, in fact, have the conditions that Dr. Olson clearly believes he does not have. Rather, the court assumed what is ultimately a question for the finder of fact, namely, that appellant did not have the condition(s) described in the medical treatise quoted in footnote 1.

Beyond this we believe that the district court assumed that because the plaintiff would not allow the doctor to touch his foot, this prevented the doctor from making an examination. As we read the doctor's report, Dr. Olson based his extensive conclusions on the examination he conducted of appellant, an examination that the doctor clearly believed adequate to support those conclusions. Indeed, nowhere in his report does Dr. Olson indicate that the examination was in any way incomplete or inadequate.

We reverse the judgment and order dismissing the complaint. The question remains whether a further examination should be ordered by the district court on remand, but we leave this to the district court's sound discretion, bearing in mind that we believe on the record before us that the appellee has already had the benefit of an examination and report that should enable it effectively and adequately to defend appellant's suit. If the district court orders a further examination, it should select the physician, time and the place for the examination and the conditions under which the plaintiff must submit. If ordered, the examination should also be conducted at appellant's expense. This is a less drastic but nevertheless effective sanction. See Waterman, *An Appellate Judge's Approach When Reviewing District Court Sanctions Imposed for the Purpose of Insuring Compliance with Pretrial Orders*, 29 F.R.D. 420, 425 (1962). We repeat, however, our view that the appellee already has an examination and report sufficient for its purposes.

Judgment reversed, cause remanded for further proceedings in accordance with this opinion.