**NATIONAL LAWYERS GUILD, Plaintiff,**

v.

**ATTORNEY GENERAL, et al., Defendants.**

**No. 77 Civ. 0999 (CLB).**

United States District Court, S. D. New York.

April 19, 1982.

See also, D.C., 94 F.R.D. 616.

---

ORDER ADOPTING MAGISTRATE SIN-
CLAIR'S DISCOVERY ORDER NO. 24
(RE SANCTIONS) AND MAGIS-
TRATE SINCLAIR'S OPINION AND
DISCOVERY ORDER NO. 26

BRIEANT, District Judge.

Discovery Order No. 24, issued by Magistrate Sinclair on April 6, 1982 recommended that monetary sanctions be imposed against the governmental defendants for their failure to obey discovery orders and recommended that any future failures of the governmental defendants to comply with discovery orders be met with proof-preclusive or case-dispositive sanctions.

Opinion and Discovery Order No. 26, issued by Magistrate Sinclair on April 8, 1982, outlined procedures to be employed in gathering evidence from F.B.I. informant files without violating the confidential nature of these materials.

The parties did not file objections or appeals from Discovery Order No. 24 or Opinion and Discovery Order No. 26, and their time to make objections and appeals has expired. *See* 28 U.S.C. § 636 (allowing ten days); S.D.N.Y. Magistrate's Rule, Rule 7.

The findings, conclusions and recommendations in Discovery Order No. 24 and Opinion and Discovery Order No. 26 are hereby adopted in their entirety and made the order of this Court.

So Ordered.

### DISCOVERY ORDER NO. 24

KENT SINCLAIR, Jr., United States Magistrate:

During the Spring and Summer of 1981 plaintiffs repeatedly voiced an intention to move for discovery sanctions against the governmental defendants. A hearing was held on September 9, 1981 to allow the parties an opportunity to present relevant evidence on this and other topics. Plaintiffs followed the hearing with a formal motion under Rule 37, F.R.Civ.P., for sanctions against "the defendants Attorney

General of the United States, Director, Federal Bureau of Investigation, and United States of America." Notice of Motion, dated November 16, 1981. Submissions on the motion were completed on April 2, 1982. The record on this motion includes, besides the transcript and exhibits from the September 9 hearing, the transcripts of other hearings before Judge Brieant and myself and all letters, memoranda and affidavits submitted to the court and filed in this action. The motion must be GRANTED in part and DENIED in part.

## A. BACKGROUND.

Plaintiffs seek sanctions for these defendants' "failure to comply with the August 14, 1980 and March 9, 1981 orders of this court and for the government's unjustified litigation of the need to submit claims of executive privilege and other privileges to the court for adjudication." Plaintiffs' Memorandum of Law in Support of Motion for Sanctions, dated November 16, 1981 ("Plts. Mem.") at 1. The defendants deny that their litigation of the need to submit privilege claims to the court was unjustified. However, for the most part defendants either admit or do not deny their failures to provide discovery; rather, they resist sanctions on the grounds that "when all the facts are considered . . . defendants are [obviously] doing everything within reason to comply with this Court's discovery orders." Defendants' Memorandum of Law In Opposition to Plaintiffs' Motion Pursuant to Fed. R.Civ.P. 37 For Sanctions, dated December 31, 1981 ("Defts.Mem.") at 12–13.

█ Both parties have insisted that a review of the full record is required to place this dispute in its framework. Moreover, "sanctions must be weighed in light of the full record in the case." *Cine Forty-Second Street Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062, 1068 (2d Cir.

1979). The ensuing recapitulation of events is based on the court's independent review of the entire record and draws on the parties' versions thereof.

### 1. *Judge Brieant's August 1980 Order.*

This hotly contested case has heavily taxed the court's resources from its incipiency in 1977. Despite Judge Brieant's frequent admonitions that good faith negotiations would obviate the need for constant judicial intervention in complex discovery matters, the parties proved unable to resolve the significant disputes bogging down the action, and, in November 1979, massive discovery motions were filed by the plaintiffs. These motions were opposed by the government. The argumentation on these motions was extraordinary in its detail and consumed many months of briefing.

On August 14, 1980, Judge Brieant decided these motions. He ordered the defendants to conduct the following discovery: (a) a search of the ELSUR index [1] and any other index which would locate JUNE files,[2] under the names of a representative group consisting of National Lawyers Guild ("NLG") past presidents, national secretaries and 30 designated members (the "representative group") (Opinion at 13–14); (b) supplementation of their responses to plaintiff's interrogatories, consistent with the Opinion (*id.* at 18); (c) a search for any responsive information concerning the representative group relating to the NLG (*id.* at 13); (d) answers to interrogatories 19 and 20(a) of the October 1978 Interrogatories (*id.* at 22–23); (e) production of the Weather Underground-Legal Support file (*id.* at 25); and (f) a search of the COINTELPRO [3] file for documents relating to the representative group (*id.* at 30). No time limits were set by Judge Brieant for this discovery. An important finding made by the Judge was that the defendants had

---

**1.** The ELSUR index is composed of three by five inch index cards containing the name of each person reasonably identified as being overheard during electronic surveillance by the FBI.

**2.** The JUNE designation, until late 1978, was placed on documents which may have related to sensitive investigative techniques.

**3.** The FBI's Counterintelligence Program (COINTELPRO) generated discrete files containing an estimated 69,000 documents.

applied an erroneous, overly narrow relevancy standard in limiting document production. *Id.* at 27. Judge Brieant also denied plaintiffs some of the relief they sought and found that "the need for discovery motions was caused equally by both parties." *Id.* at 31. The parties were further directed to make a good faith attempt to settle future problems without the court's assistance and to take any future disputes to me. *Id.* at 31.

### 2. The Magistrate's March 9, 1981 Order.

Upon learning that Judge Brieant had assigned the case to me for all pretrial purposes, I scheduled a conference for October 27, 1980. At that time, defendants were directed to perform, *inter alia*, the following tasks: (1) deliver the Doron Weinberg JUNE documents for *in camera* inspection by November 16, 1980; (2) produce FBI Headquarters "see-references"[4] by December 12, 1980; (3) verify by November 16, 1980 the existence of an index, if any, to the SDS file; (6) produce the Weather Underground-Legal Support file by November 27, 1980; and (7) produce certain COINTELPRO documents by November 10, 1980. Generally speaking, the implementation of Judge Brieant's Order required that these tasks be performed and I merely set out a timetable for performance. Defendants completed these tasks on or about the deadlines imposed. The only exception was production of the Weather Underground-Legal Support file, which was the subject of a request for a six-week extension.

It became clear even before the October 27, 1980 conference that the parties did not share an understanding of how and when Judge Brieant's August 14, 1980 Order would be implemented. Another issue which emerged in pre-conference papers and at the hearing itself was the question of what to do about the numerous documents and parts of documents withheld from production on the grounds of privi-

lege. A briefing schedule was set up and another conference was scheduled. *See* Tr. of 10/27/80 Conference at 70.

On the privileges issue, the defendants took the position that, although the law clearly required submission of privilege claims for review by the court, it would be unduly burdensome for the defendants to submit such claims in this case because the number of claims was extremely large and would make presentation burdensome. *See, e.g.,* Defendants Memorandum in Opposition to Plaintiffs' Motion to Compel, dated October 29, 1980 ("Defts.Mem. of 10/29/80").

As defendants outlined the burdens of privilege claim submissions at the ensuing conference, November 25, 1980, a somewhat startling fact emerged: when the defendants produced the F.B.I. Headquarters ("H.Q.") files on the NLG, many, if not most, documents were produced in redacted form but no record had been kept of why the deletions were made. Thus, documents were produced that were blank; documents were produced that had been subjected to extensive deletions; documents were produced that were partially deleted—and there was no way to tell if the deletions were made on the ground of executive privilege, informants' privilege, attorney-client privilege or some other ground. Indeed, the F.B.I. did not know either and could not explain the H.Q. file deletions without starting from scratch and reviewing each page once again and marking each redaction with a deletion code.

It also developed that some H.Q. file documents were deleted on the grounds that they or portions of them were irrelevant ("1B" deletions); this assessment was made by F.B.I. staff at a time when the defendants were utilizing an improper, overly narrow standard of relevancy. *See* August 14, 1980 Opinion. Since no record of these deletions had been kept, it was, similarly, impossible to determine whether a deletion was on relevancy grounds or some other ground without starting from scratch and

---

**4.** "See-references" are designations in a particular file of a document in a second file that

contains significant investigative data about the subject of the first file.

reviewing each item again. Further, and subsequent to the November 25, 1980 hearing, it became clear that some deletions were made for the peculiar reason that the document or part of the document did not "relate to the subject of the file" ("1A" deletions). *See* March 9 Order at 5. Defendants were unable to justify these deletions under the federal rules or privilege concepts, and, like the other deletions in the F.B.I.H.Q. files on the NLG, no record has been kept of deletions made on this ground.

In short, in late 1980 it became sadly clear that a substantial portion of previous document production had been handled in such a manner that complete re-production was required if the defendants were to comply with Rule 26, as applied to this case by Judge Brieant, and if the defendants were to be required to submit claims of privilege for court review, as required under the law and Orders in this case.[5]

A second topic raised at the November 25, 1980 conference was the concept of a rolling discovery schedule. Plaintiffs expressed their desire that the defendants produce the fruits of their discovery tasks on a periodic or "rolling" basis, rather than waiting until the entire task was completed before anything was produced. Defendants stated that they did not see why discovery could not be done that way and offered to produce the fruits of discovery once each month. Tr. at 59–60.

A third topic was also brewing: F.B.I. informant files. The F.B.I. estimated at the time that around 1300 of the informants it had employed over the years had reported about NLG related matters and had been involved in defendants' NLG related activities. The F.B.I. estimated that some 4,400,-000 documents were contained in the files of these informants. Plaintiffs wanted this material, and the defendants sought to have it deemed privileged from disclosure. The

treatment of these materials had not been presented to Judge Brieant for a ruling, and the document production ordered by him did not specifically include these informants' files.

On January 5, 1981, I issued a Memorandum Opinion which held that the burdens entailed in the submission of defendants' privilege claims for review were not so great as to exempt defendants from the obligation properly to present such claims. The law simply does not permit parties to arrogate to themselves the right to make final evidentiary privilege determinations. The January 5, 1981 opinion also proposed a schedule for some discovery items, *exclusive* of future document production (and related privilege claims) ordered by Judge Brieant and supplementary interrogatory answers to be culled from that future production. The parties were permitted time to comment on the proposed schedule.

After the submission of extensive comments on the matters raised in the January 5, 1981 Opinion, a Memorandum and Order directing discovery from defendants was issued on March 9, 1981. The discovery obligations imposed by it were understood by defendants to involve:

(a) submission of affidavits regarding the SAC files and "Do Not File" documents, the HUNTER files, and field office responses to production instructions; (b) submission of claims of privilege for the Weinberg JUNE documents; [ (c) reprocessing of H.Q. files to affix a deletion code and reprocessing of selected 1B deletions and all 1A deletions]; (d) submission of an affidavit by one of the *Felt-Miller* prosecutors; and (e) submission of thirteen informant files consisting of more than 350 volumes for review by the Court.

... [ (f) ] supplementation of answers to interrogatories 1, 2, 11, 12 and 22 of the

---

5. As defendants stated, reproduction was necessary because there was no contemporaneous record of what was deleted from the NLG "Headquarters file": "... for reasons I cannot explain the code was not used." 11/25/80 Tr. at 36. Prior to this time, however, defendants had been willing to make unfounded represen-

tations about what was or was not deleted. *See, e.g.,* Salerno letter, dated November 18, 1980 ("It is my understanding that, quite simply, the information sought was not deleted from any of the production made heretofore ...").

plaintiffs' October 1978 interrogatories based on documents previously retrieved; [(g)] submission of a log listing privileges claimed with respect to each [privilege] deletion made in documents released to plaintiff...

Defts.Mem. at 5–6 (footnote omitted). These tasks were to be performed within 60 to 90 days. The March 9 Order *did not* order a schedule for the new document production necessitated by Judge Brieant's August 1980 decision (estimated by the government to involve 550,000 pages); it *did not* order a log prepared now for all privilege claims that might arise out of the new production (the defendants understood this, *see* Memorandum In Support of Defendants' Appeal From Magistrate's Order ... dated 4/13/81 ("Defts.App.") at 12; it *did not* order production or deny protection of the informant files (estimated at that time by defendants to contain 4,400,000 documents); it *did not* schedule the provision of supplementary interrogatory answers that Judge Brieant had ordered to be given in connection with the new document production. As to these items for which no schedule was established, the parties were required to (a) submit plans for disposition of the informants' files; and (b) meet and negotiate a schedule for document production, privilege claim review, and provision of supplementary answers to interrogatories on a monthly, rolling basis. *See* March 9, 1981 Memorandum and Order at 12–15.

3. *The Spring and Summer of 1981.*

At the end of March, 1981, defendants submitted letters and affidavits which outlined their views on the March 9 Order. They "informed" the court that the small items could be complied with,[6] but they told the court that they could not and would not comply with the parts of the order requiring them within 60 to 90 days to (a) supplement interrogatory answers based on documents previously retrieved; and (b) submit a log of privilege claims for documents previously retrieved and released to plaintiffs.

The defendants' position was a surprising one for a number of reasons that went beyond its unmitigated arrogance. First, they did not challenge the substance of the March 9, 1981 Order, only the time limits it imposed. This was surprising because the 60–90 day time limit imposed (a) related to some tasks, like supplementing interrogatory answers, that had been ordered performed six months before by Judge Brieant; and (b) defendants' time to comply would be extended by any appeal to Judge Brieant. March 9, 1981 Order at 11.

Second, one reason given by them for their alleged inability to comply with the March 9 Order was that they preferred to work on discovery tasks of their own choosing. Defendants had learned, subsequent to issuance of the March 9 Order, that they had bungled virtually *all* their prior production. The March 9 Order had directed them (a) to affix a deletion code to redactions in documents produced from "Headquarters files," *see id.* at ¶ 3(c); Order of January 5, 1981 at 6–7; (b) to review headquarters documents redacted on relevancy grounds and non-headquarters documents redacted on relevancy grounds identified by plaintiffs, *see* March 9 Order at 6, ¶ 3(c); to review all documents deleted on 1A grounds. *See* ¶ 3(d). The defendants informed the court that the great bulk of this task—coding the F.B.I.H.Q. file on the NLG[7]—could easily be done on time. *See* Vornberger Declarations of March 31, 1981 (H.Q. files on the NLG could be coded within forty-five days of March 9 Order). But,

---

**6.** But the provision of the informants' files for *in camera* review soon came to involve a series of unusual false starts described *infra* at 607–608.

**7.** Although the March 9 Order directed coding of "Headquarters files," the defendants had represented that only the F.B.I.H.Q. files on the NLG were not coded prior to production. Salerno letter of 12/15/80 at 2; 11/25/80 Tr. at

**36.** They further represented that only about 15,000 documents would have to be coded. 11/25/80 Tr. at 19. Defendants understood the direction to code "Headquarters' files" as a direction to code only the "NLG Headquarters main file." Salerno letter of 3/30/81. Besides the NLG H.Q. file, prior H.Q. file production consisted of only one file drawer. Defts. Mem. of 10/29/80 at 2.

defendants stated, it would take them at least seven months to reprocess all the prior mishandled production, and they intended to do this before complying with the March 9 Order. *Id.* Nearly all of this additional reprocessing, the only exceptions being 1A deletions and selected 1B deletions, was not ordered by me and was an obligation voluntarily assumed by defendants upon their belief that virtually their entire prior production was flawed by erroneous deletions.[8]

Third, as became more fully documented when the defendants appealed the time limits of the March Order to Judge Brieant (a process that lasted nearly *3* months), the entire claim of inability to comply was swimming with red herrings and took the essential form of a non sequitur. To begin with, the defendants falsely stated to Judge Brieant that the March 9 discovery order required them within 90 days to perform all the new production (an estimated 550,000 pages) ordered in August 1980 by Judge Brieant:

> Mr. Gimbel: I think this is set forth in our affidavit, but there are 550,000 pages and that all has to be produced within 90 days. That just can't be done.
>
> \*    \*    \*    \*    .    \*
>
> Mr. Gimbel: Your Honor, we are trying. We have 14 people working full time. There are 550,000 documents.
>
> \*    \*    \*    \*    \*    \*

One of two Transcripts dated May 20, 1981 at 9, 10. The affidavit referred to is that of Agent Vornberger, dated March 31, 1981 (Exhibit A to Defendants' Notice of Appeal), which goes on at great length about document production ordered by Judge

Brieant on August 14, 1980. This production was *not* among the tasks directed by me to be done within 90 days; rather, the parties were directed to negotiate a monthly production schedule for this material and for the supplementary interrogatory answers to be culled from it. Yet, the defendants falsely asserted that I ordered these tasks performed within 90 days. Next, the defendants raised objections to the "rolling discovery" concept. They stated that, in their view, it would be better to do one thing at a time. Thus, defendants thought that to avoid a "frightful waste of time", Defts.App. of 4/13/81 at 11, it would be better to do all the document production ordered by Judge Brieant and then later, sometime in 1984 or 1985 at the earliest, begin supplementing interrogatory answers and, later still, begin making a log and submitting privilege claims. *Id.* at 11, 12, 13. This, of course, would mean that all documents in the universe of materials ordered produced by Judge Brieant would have to be reviewed three or four times instead of just once, and this would take at least four or five more years at the defendants' projected pace for the initial review, putting the trial back to 1990! The March 9 Order reasonably required a rolling schedule[9] that would involve only *one* document review, with the spin off tasks—privilege claim submission and interrogatory supplementation—being performed in pace with the document production. Charitably viewed, the governments' argument on this score stands as a monument to make-work and a Trojan horse that should deceive no one.[10] *See, infra,* at n.19.

---

8. Judge Brieant did not, of course, know that defendants had completely mishandled prior production when he found, in August 1980, that the defendants had not acted in bad faith. Defendants had made much of this prior production to Judge Brieant and had frequently said that it exemplified good faith. Now, defendants stated, there was no way to tell what had been deleted in H.Q. files, Salerno letter of 3/31/81 or if field office file deletions were correct, Vornberger 3/31/81 Declaration, without reviewing the entire production.

9. Judge Brieant noted the value of rolling discovery to expedite and narrow discovery. *See* One of Two Transcripts dated May 20, 1981 at 14.

10. On a similar note, the defendants suggested that it would be better to make the Attorney General sit down for a month or whatever it might take to review *all* executive privilege claims, instead of spending ten minutes or so a week on it. In any event, nothing in the March 9 Order would have prevented them from presenting all executive privilege claims to the Attorney General in one installment.

The defendants' appeal also assailed the portion of the March 9 Order that required them to prepare a log of privilege claims "as to material already produced ... and [perhaps] on an ongoing basis with respect to future document production." Defts. App. of 4/13/81 at 12. Defendants ridiculed this requirement as "useless", "unnecessary", and "wasteful". *Id.* In the court's view, the seconds required during the course of defendants' document review to record the basics about a document would result in a log which would have given everyone, for the first time, some idea of the scope of privilege claims and would have enabled the court to determine if individual or sampling review was more appropriate and whether a special master had to be called in. But, most importantly, the log was required for the same reason it is required in every litigation of this scope: to keep track of things. The irony of their past ridicule of this simple notion should be clear to defendants now: if they had prepared a log in the first place, like any sensible, responsible litigant, they would not have had to reprocess the F.B.I.H.Q. file on the NLG to affix a deletion code.[11]

The defendants' final argument to Judge Brieant was that the United States lacked the resources and manpower to comply with the March 9 Order.

On June 3, 1981, Judge Brieant affirmed[12] the March 9 Order (90 days had elapsed, so the defendants had effectively doubled their time to comply with the March 9 Order).

Over the next couple of months it became crystal clear that the defendants were not going to comply with the March 9, 1981 Order and the August 14, 1980 Opinion. On July 24, 1981, I issued Discovery Order No. 3, which found that the defendants' careless estimates and projections of the burdens involved in complying with their discovery obligations were unworthy of reliance.[13] Discovery Order No. 3 also noted that the defendants had yet to provide *any* legal support for their position that the United States, unlike a private litigant, could lawfully devote plainly insufficient manpower and resources to its discovery obligations. Further, Discovery Order No. 3 noted that the F.B.I. was redoing all prior production but did not excuse defendants from current binding obligations just because their prior production suffered from mistaken, impermissible and unrecorded document redactions and just because *they preferred* (for no stated reasons) to devote their time to this task alone. A hearing was scheduled for September 9, 1981 in the hope that an adversary factfinding process might be more effective at getting to the truth about the discovery burdens involved.[14] Further, it was coming to light that defendants had destroyed some material after plaintiffs had made discovery requests for it, and plaintiffs had expressed an intention to move for

**11.** Defendants attempt to explain this snafu by asserting that it was then a permissible FOIA practice to release documents without keeping records. Whether or not this is true, no satisfactory explanation has been forthcoming of why FOIA practices were used to respond to a Federal Rules of Civil Procedure discovery request. *See* Krinsky Aff. of 3/9/82. The FOIA may or may not require submission of privilege claims for review by the court, but the F.R. Civ.P. and case law interpreting the rules do.

**12.** It is not clear that defendants' false statements had any influence on Judge Brieant's decision, but these discovery disputes—so complex, so numerous—are difficult enough to come to grips with in the absence of false statements.

**13.** In Discovery Order No. 3, the specific example of such unreliability (there was more than one to choose from) was the defendants' ap-

proach to estimating how many documents were in the informants files. *See id.* at n.1. It later turned out that the defendants' "estimate" of 4,400,000 informant file documents was off by *at least* (and probably much more) 1,400,000. *Yet, defendants fully expected the court to rely on the original estimate and it was submitted in sworn form.*

**14.** Back in February 1981, the government offered to produce a witness to testify that the document production ordered by Judge Brieant really amounted to 550,000 documents. Since I intended to leave scheduling of this production to the parties and did not include a schedule for it in the March Order, and since this task was no hindrance to the performance of tasks I ordered, I did not accept this offer.

sanctions for that destruction and for defendants' flouting of longstanding court orders. A secondary reason for the hearing was to permit the parties an opportunity to make their record on these sanctions related matters.

Meanwhile, the court was attempting to fashion a method for balancing the plaintiffs' discovery rights to, the defendants' privilege in, and the court's duty toward the large numbers of documents in informant files. These matters had vexed other courts,[15] and the defendants had convinced me that it would be pointless to require them to search these materials for documents that were not covered by the informants' privilege. *See* Discovery Order No. 4. In March, 1981, I had directed defendants to produce some sample files for *in camera* review. Defendants, for whatever reason, dragged their feet on this. Then the government insisted on conducting a security investigation of me, without offering any direct authority in support of its view that this was necessary and in spite of the fact that I had been cleared when I was appointed to this office. Yet, the government insisted, and the months dragged on. Finally, I learned that I had received clearance and was assured that the documents would soon be produced. Then, however, I was informed that the first security check was not good enough and a further one would have to be conducted. The reason given for this was that the first security check was for clearance to "Secret" documents but that another security check was needed for "Top Secret" documents. The months dragged on. It eventually unfolded that the full spectrum of sample files was not produced until *after* the hearing for which I stated I required them in subsequent orders describing the files to be produced. These frustrating episodes appear consistent only with a desire by defendants to delay.

On another front, a July 15, 1981 letter from defendants brought to a close a thoroughly pathetic performance by them of the duty to negotiate in good faith with plaintiffs. In the March 9, 1981 Order, I directed the parties to meet and negotiate and then to submit within one hundred (100) days joint or several plans to the court with regard to a schedule for, *inter alia*, the document discovery ordered by Judge Brieant. Nothing happened within 100 days, so a thirty-day extension was granted at the parties' request. The parties attempted to meet and negotiate, but meetings were repeatedly cancelled, and new counsel for defendants—who appeared to know very little about discovery in this case—were assigned this task, necessitating efforts by plaintiffs' counsel to educate them. Then defendants offered a "comprehensive proposal," which, incredibly, purported to "offer" the plaintiffs this deal: we will do *some* of the document production ordered by Judge Brieant in 1980 if you waive *all* other rights to discovery *including all other discovery previously ordered by Judge Brieant.* Dollinger to Krinsky, letter of July 8, 1981. The unreality of their "comprehensive proposal" was apparently lost on defendants; a week later, on July 15, 1981, they sent me a letter purporting to contain the planning proposal I had given them over 130 days to prepare, and this *two and a half page letter* was devoid of any specifics and simply repeated the strange offer made to plaintiffs.

4. *The September 9, 1981 Hearing and Afterwards.*

The September 9 hearing was thereupon held, six months after the March 9 Order and nearly thirteen months after Judge Brieant's August 1980 Opinion. As of that time, the defendants had not yet completed any of the significant tasks ordered by Judge Brieant and had not yet begun others.[16] The defendants had failed to com-

---

**15.** *See In Re Attorney General*, 596 F.2d 58 (2d Cir. 1979).

**16.** *I.e.*, production using representative groups, of main and field office files, COINTELPRO

documents, JUNE documents, documents indexed in ELSUR index, see-reference documents had not yet begun, though quite a bit of retrieval had taken place. Defts. Mem. at 13–25 and citations to September 9 Transcript

plete tasks required to be completed under the March 9 Order: preparation of a log for documents previously retrieved, supplementing interrogatory answers based on information culled from previously retrieved documents, reprocessing of documents with 1A and 1B deletions, submission of a monthly installment of privilege claims. All of these items were overdue as of September 9, 1981, even calculating their due dates from Judge Brieant's June 3, 1981 affirmance of my March Order.

It cannot be said that the defendants disobeyed the black-letter requirements of Judge Brieant's August 1980 Order, since it did not impose time limits. Quite clearly,

however, defendants' failure to make significant progress with respect to the obligations imposed on them by that Opinion was and is utterly inconsistent with that Opinion and the frequent, unequivocal oral directives of the Judge.[17]

Moreover, it is admitted that the defendants were in default of the March 9 Order to the extent outlined above.[18]

Defendants defend against the imposition of sanctions on the grounds that the United States lacked the resources and manpower to comply with outstanding discovery orders and that their failure was due to inability, not willfulness, bad faith or fault.[19]

---

therein. Apparently, no supplementing of interrogatory answers had been done at all. Also, it is apparently defendants' position that ELSUR material and JUNE documents for the representative group cannot be retrieved except in conjunction with general document review. It is otherwise "physically impossible to remedy" some unexplained "intermingling," Vornberger 4/1/82 Declaration at ¶ 10, of JUNE material.

Other tasks have not been completed. *See* Plts. Reply Mem. of 2/8/82 at 1–6.

**17.** *See, e.g.,* May 7, 1980 Tr. at 2–4 ("the totality of the picture suggests to me that we are not getting the kind of cooperation on pretrial discovery that needs to be had in a litigation of this sort"); Feb. 15, 1980 Tr. at 60 ("you [defendants] have what they want . . . meet them part way and give them as much as they are reasonably entitled to"); October 25, 1979 Tr. at 27 ("The information has to be processed. You have to get the discovery done, and it has to be reached for trial."); October 2, 1979 Tr. at 28 ("Having given the citizen the right [to information] they have to act in a reasonable time."); Tr. of November 23, 1977 at 15 ("When the Court enters an order in a case, the Court cannot be put in a position of pointing an empty gun or bluffing, and if I really do enter an order, if I don't get a factual showing for or a basis for noncompliance of the order I will . . . do whatever I have to do.").

**18.** Since the hearing, defendants have reprocessed the selected 1B deletions and 1A deletions, except possibly for some of the "see-reference" production. Defts. Mem. at 13–25.

**19.** The defendants do, in addition, indulge themselves in a cynical attempt to revive the argument put to rest by Judge Brieant and me last Spring. In attempting to excuse their failure to provide any interrogatory supplements, a log and an installment of privilege claims, they argue that these tasks had to await the

performance of other tasks. Thus, they state that they preferred first to do a task that the court never ordered, *i.e.* review and reprocessing *other than* that required to affix a deletion code to uncoded redactions in documents previously produced from H.Q. files and to remedy selected 1B deletions and 1A deletions, and *then* perform all document production ordered by Judge Brieant, and *then* rereview all the documents to answer interrogatories and *then* rereview all the documents a third time to make a log and privilege claims, so as to be ready for trial around 1990. Defendants say that this approach will result in their providing plaintiffs with the " 'largest amount of material possible in the least amount of time.' " Defts. Mem. at 28, quoting Vornberger Declaration of December 24, 1981 at ¶ 24.

First of all, as discussed previously, this approach will require three or four document reviews instead of just one. Defendants can supplement the interrogatories simply by designating produced documents, so this will not add much time to production. Preparation of a log is a very quick process which would add only seconds to the time required to review each document. So all the tasks ordered can be performed with one document review. The representative group production ordered by the Judge simply has no relation to the tasks ordered by the March 9 Order to be done within 60–90 days. The *only document review* ordered to be done in that time by the March 9 Order related to the affixing of a deletion code to uncoded redactions in documents previously produced from H.Q. files and selected documents with 1A and 1B deletions, and defendants never said that they could not complete these tasks within the allotted time. Second, doing it the court's way is certain to result in reducing discovery burdens on the court and the parties. As Judge Brieant noted, rulings made early in the rolling schedule will reduce the number of rulings that have to be made

Defts. Mem. at 41, 50, 52. Their evidence concerning the impossibility of complying with discovery obligations was presented at the September 9 hearing through the testimony of Thomas E. Vornberger. Sworn written statements were also received from this witness, an F.B.I. Special Agent for over two decades who since 1977 has been chief of one of the F.B.I.'s two Civil Discovery Review Units ("CDRU").

In the course of his testimony about the impossibility of compliance with discovery orders, Agent Vornberger testified about three related subjects: the volume of materials subject to discovery, the extent of defendants' compliance with discovery orders, and the defendants' current allocation of manpower and resources to their discovery obligations in this case. Pre and post-hearing sworn written statements were also submitted on these three matters.

On the first two matters, several noteworthy facts emerged. Some highlights:

(a) that two packages of ELSUR indexed documents had been sent to New York for production, but after Judge Brieant ordered them produced in August 1980, the defendants' New York counsel failed to turn them over for sixteen months. His explanation: "I had forgotten about

the material ..." (Salerno Declaration, dated 12/21/81, at ¶ 3);

(b) that the informants' files are estimated to contain less than 3,000,000 documents, as opposed to the previous estimate of 4,400,000 (Tr. at 110); [20]

(c) that 51 informant field office files subject to outstanding discovery requests have been destroyed since January 16, 1978, most, but apparently not all, being destroyed "in compliance with normal file destruction procedures" (Vornberger Declaration, 11/10/81);

(d) that mishaps, improper and erroneous deletions and other misfeasances that had plagued prior NLG H.Q. file document production had resulted in plaintiffs originally receiving only two-thirds (15,381 pages) of the *processed FBI* documents that they should have received (22,279 pages) (Vornberger 12/24/81 Declaration, at ¶ 22); [21]

(e) that defendants continue in their inability to give the court a coherent understanding of the scope of their prior document production, now representing that the figure is 94,500, see Defts. App. of 4/13/81; Defts. Mem. at 2; Dollinger

---

later. Also, plaintiffs will be in a better position to prepare their case and have promised to use the material they get to narrow outstanding requests not yet complied with. It is pure pretense for the defendants to say that their make-work approach is intended as a favor to plaintiffs. What they really want to do is wait until the last minute and then dump a huge mass of material on plaintiffs when it will be too late for them to use it.

Thirdly, and most importantly, the court ordered defendants to do it one way and they have no right to substitute their judgment for the court's. Judge Brieant warned the parties that when they sought the intervention of the court there would be three views on how discovery should proceed instead of just two, and the defendants promised to comply with the court's view. 2/15/80 Tr. at 44–46. Now, after getting the court's view, they refuse to do what the court ordered, choosing instead to do other, unordered tasks and to conceive of an illogical, wasteful discovery plan that would geometrically increase their discovery burdens and result in great delay.

**20.** Also, Vornberger testified that at least 90% of these documents had nothing to do with this

case. My *in camera* review of the files produced to me tends to confirm Vornberger's testimony.

**21.** These figures do not include the production of *un*processed documents from H.Q. NLG files, either "7,381 pages" or "more than 7,381 pages", depending on which contradictory sworn statement is more nearly correct. *Compare* Vornberger Declarations of 12/24/81 at ¶ 22 and 4/1/82 at ¶ 17. As defendants themselves admit, it is undisputed that only 15,381 pages of processed documents (*numbered by them*) were originally produced, see Defts. Mem. of 10/29/80 at 2; 11/25/80 Tr. at 19, and that 22,279 pages of processed documents (*also numbered by them*) were later produced, see Vornberger 12/24/81 Dec. at ¶ 22. This alarming episode in which one third of the concededly producible materials from a batch of production were mishandled is one for which no explanation has been provided. It would never have happened if a log had been prepared in the first place or if defendants took their discovery obligations seriously.

7/15/81 letter, when the earlier, repeated estimate was 60,000, *see, e.g.,* Defts. Mem. of 10/29/80 at p.5.[22]

Prefatory to explaining why the United States was unequipped to comply with the discovery orders, Agent Vornberger outlined the present scope of defendants' resource and manpower commitments to discovery obligations. He stated that a field agent at each of the 59 field offices was involved in retrieving documents and sending them to H.Q. At H.Q., approximately nine people from outside Vornberger's unit involve themselves and look at the documents to see if there is any classified information in them. Concurrently, about 14 analysts in Vornberger's unit and some four persons from the F.B.I.'s Office of Legal Counsel conduct a review, principally to make informants' privilege deletions but to make other deletions as well. Persons from a Messenger Unit, a Service Unit, and a Special File Room also help out by pulling files · from bins and shelves and carrying them around H.Q. Tr. 111–118; 147; 171.

On the issue of why such limited manpower and resources were all that could be allocated by the United States, Vornberger's testimony was brief. He stated that no more people from his unit could be put on the job because of other obligations; that there is another CDRU but that unit has jobs of its own; that more people cannot be hired because of a hiring freeze; that other F.B.I. people cannot be used because they do not have the requisite training; that people from outside the F.B.I. cannot be used because much of the documents' contents must be kept secret. *Id.*

## B. DISCUSSION.

Defendants assert that "when all the facts are considered . . . defendants are [obviously] doing everything within reason to comply with this Court's discovery orders." Defts. Mem. at 12–13. Defendants apparently mean, by this, that their failures and misfeasances must be excused because they were not intentional but merely the result of understaffing:

Simply put, defendants have done and are doing all that they reasonably can do within the confines of their resources and other discovery obligations. Defendants have not refused to conduct any court-ordered discovery—they merely have been unable to comply within the deadlines imposed.

Defendants therefore submit that they have acted reasonably and exercised utmost good faith in discharging their discovery obligations, and the failure to comply with discovery schedules is *substantially justified* when their limited resources are compared with the extent of plaintiffs' demands.

Defts. Mem. at 32 (original emphasis deleted; new emphasis added). Analysis of this argument requires a discussion of (1) defendants allocation of resources and manpower towards meeting its burdens; and (2) the scope of the discovery burdens resting on the defendants.

### 1. *Manpower and Resources.*

Except for document retrieval and classification review, Vornberger's CDRU is doing all the significant work. Vornberger says that, on the average, 14 analysts are working full time, but a review of the declaration filed by him demonstrates that the number is closer to twelve.[23] Defendants'

---

**22.** The seriousness of this very real and ongoing problem bears special emphasis. It is not limited to prior document production; nearly every estimate or statement of their burdens, past, present, or future, that the defendants have made in this case, whether in sworn or unsworn form, has been retracted and replaced (1) with a new one that is significantly different (in some cases 30%–50% different); and (2) without any acknowledgment that prior estimates or statements were wrong. It should be plain to the defendants by now just how difficult this persistent practice makes discharge of

the court's responsibility to guard them from undue burden, yet it does not appear that to date they are taking this concern to heart.

The impression conveyed is that the defendants simply do not care what they represent to the court, and their course of conduct does not inspire confidence in the accuracy of the few burden estimates or statements that have not been revised.

**23.** Since June 1981, Vornberger's personnel have been putting in an average of 2054 hours a month. Given a 40 hour work week (or 168

counsel are apparently not involved at all, except to the extent of arranging deliveries. F.B.I. special agents are not used either, despite the fact that they have been used to a significant degree in other cases [24] and were used at one point in this one.[25]

### 2. Burdens.

Defendants have never had any trouble getting Judge Brieant or me to agree that "significant discovery responsibilities of a large scope rest on the government." Discovery Order No. 3 at p.2. Defendants have, however, been less successful at getting the court to agree with their assessment of where the burden comes from and what its approximate scope really is.

In defendants' view, plaintiffs have a gluttonous "appetite", Defts. App. of 4/13/81 at 14, for discovery and are wont to make "extraordinarily voluminous demands," Defts. Mem. at 29, and this is primarily where the burden comes from. Defendants seem to think that the plaintiffs are more interested in disrupting their day-to-day activities than they are in getting relevant evidence and are making discovery requests just to be troublesome and pernicious. The fact is, however, that the defendants have accumulated an extraordinary amount of material about plaintiffs that is relevant under Rule 26. The defendants paid or used over a thousand people to report, *inter alia*, on plaintiffs, and these people generated an immense amount of material contained in informants' files. Through these and other means, defendants have amassed a half-million or so more doc-

ument pages in H.Q. and field office files which defendants concede are relevant to plaintiffs' claims under Rule 26,[26] as interpreted by Judge Brieant. Thus, the burdens resting on defendants that the court must guard from becoming undue flow not as much from plaintiffs' discovery requests as from the defendants' large appetite for collecting and keeping material that relates to plaintiffs' claims.

■ The sheer number of documents is not the only source of burden. As the court has always recognized, the defendants have a strong confidentiality interest in these materials, and the law places special burdens on litigants who wish to protect their confidentiality interests by asserting evidentiary privileges. Before the court can protect defendants from being overly burdened by the rules governing assertions of privilege, however, the court requires that the scope of any such claimed burden be clearly demonstrated, and defendants have resisted every attempt by the court to get them to do this. Two examples are defendants' footdragging with respect to the production of informant files for *in camera* review, *see supra* at pp. 607–608, and defendants' refusal to prepare a log of privilege claims for documents and portions of documents withheld from production, thus insuring that the court would be kept in the dark and prevented from fashioning an order that would relieve defendants of any burdens relating to these items. Defendants have a right to expect the court to protect them from undue burden, but defendants have been preventing the court from doing that, while at the same time

---

hours a month) this means that most of the time 12 people are working full time, but once every several months 13 people are working full time. Vornberger Declaration of January 19, 1982. Apparently, no overtime work is performed.

**24.** *See* discussion, *infra*, at n.30.

**25.** And when used, apparently performed at least as satisfactorily as Vornberger's unit. F.B.I. agents processed the H.Q. main file on the NLG and did not keep a record of their

deletions, assertedly an FOIA practice at the time. Vornberger's unit did the bulk of the processing and made enough mistakes that, in the F.B.I.'s view, it was necessary to redo their work.

**26.** Defendants acceded to plaintiffs' interpretation of relevancy under Judge Breiant's August 14, 1980 Order, objecting only to producing an entire document when only part of it is relevant. *See, e.g.*, Tr. of Oct. 27, 1980 Conference at p. 48; Salerno letter of November 18, 1980.

loudly and speciously proclaiming their martyrdom.[27]

### 3. Burdens Flowing From the March 9 Order.

The burdens perceived by defendants to flow from the March 9, 1981 Order were largely the product of their imagination.

The parts of that order that defendants announced that they could not comply with (*prior even to trying*) were (1) supplementation of interrogatory answers within sixty (60) days, a time limit extended by approximately *90* more days, *see* Order dated March 18, 1981 (requiring commencement only of tasks not subject to reargument or appeal to the Judge); and (2) preparation of a log for documents withheld from prior production on grounds of privilege [28] (a time limit extended by the appeal process for approximately 90 more days). Admittedly, the time periods—generous as they were considering the extensions and the fact that the defendants knew they had to supplement the interrogatory answers *six months*

*before*, in August 1980—were established at a time when defendants had told the court that 60,000 documents had to be looked at to do these tasks. Immediately after the March 9 Order was entered, of course, defendants suddenly concluded that there were 94,500 documents involved, but even this number could have been looked at and the required tasks performed within the generous time limits allocated. The reasons given by defendants for their failure to comply—that they wanted to perform a lengthy, unordered task (reprocessing of all prior production) and that they wanted to first review all the documents ordered produced by Judge Brieant (a task I did not order done yet; it was only ordered that it be planned) are obvious red herrings and were burdens imposed by the March 9 Order only in defendants' imagination.[29]

In sum, the March 9 Order did not require the impossible. Defendants had to manufacture burdens that were not in the Order just to make out a colorable argument that compliance was impossible. In-

---

**27.** After defendants finally managed to produce informant files for *in camera* review, the court has been able to review them and is considering provisions that will give defendants relief from a potentially great burden.

**28.** Defendants have always understood that the log was to be prepared in the first instance only for previously produced items, then supplemented to include documents withheld from production in the ensuing months. *See, e.g.,* Defts. Appeal of 4/13/81 at 11, 12; Deft. Mem. of 12/31/81 at 6.

**29.** Defendants implied to Judge Brieant (1) that I had ordered all the reprocessing, *see* Defts. Appeal of 4/13/81 at 8; and (2) that I had ordered "new discovery" amounting to "550,-000 pages of documents." *Id.*

First, as mentioned before, the reprocessing I ordered included only (1) affixing of a deletion code to uncoded redacted documents from H.Q. files; and (2) remedying of selected 1B deletions and all 1A deletions. Most of the reprocessing was undertaken by defendants "voluntar[ily]," in "good faith," and in the absence of court order. Defts. Mem. at 14. Defendants cannot have been confused on this point. *See* n.7 *supra.* Subsequent orders made it clear, *see* Order dated May 19, 1981 ("While to a very limited degree further work has been required by intervening decisions of this court, the principal reason is that the prior coding used a

wrong set of deletion categories"), and they requested clarification only as to their duty with respect to 1B and 1A deletions. *See* Salerno letter, dated Feb. 2, 1981. Defendants stated that they could comply with the reprocessing tasks that I ordered, *id.* at 7, after they were alerted on January 5, 1981 that they would be required to do them. *See also* 9/9/81 Tr. at 236–238.

Second, I did not order the new document production defendants referred to; Judge Brieant did. Nor did I order a timetable for this production. I merely asked the parties to negotiate in good faith and present joint or several timetables. (Defendants did not do this.) Performance of this document production was to be done *after* the tasks ordered on March 9, and yet the defendants insisted on doing this first, and using this as an excuse for not preparing a log, submitting any privilege claims, or providing supplementary answers to interrogatories. Defendants might have plausibly argued that uncertainty over the scope of informants' privilege was a hindrance to the preparation of a log. *See* March 9 Order at 6. But they have not mentioned that this was any hindrance, and have relied solely, and even prior to issuance of the March 9 Order, *see* Salerno letter of 2/2/81, on the argument that preparation of a log must await completion of all document review and production.

stead of working on the tasks ordered to be done, the defendants substituted their judgments for the court's and worked on other discovery matters instead of the ones ordered by the court. They claimed that other, large tasks ordered by Judge Brieant had to be done before the tasks ordered in the March 9 Order were done when it simply was not true. Their estimates of the documents that would have to be reviewed to supplement interrogatory answers, 60,000 before the March 9 Order was entered, suddenly grew to 94,500 when they appealed to Judge Brieant. Their conduct was inconsistent with an attitude of reasonable cooperation; it was consistent with a desire to keep the court in the dark, to prevent plaintiffs from getting interrogatory answers, and to play the martyr and gratuitously treat the court as an adversary, forcing an unnecessary showdown.

## C. SANCTIONS MUST BE IMPOSED.

I find that the March 9, 1981 Order could have been complied with given the present level of manpower and resources devoted to the case. I find also that defendants have failed to offer evidence to the contrary. I

further find that, had they wanted to, the defendants could have allocated more manpower and resources to their discovery obligations in this case.[30] Defendants have failed to offer evidence to the contrary.

Provisions of the March 9 Order with which the defendants failed timely to comply are ¶ 2(a) (supplementary interrogatory answers); ¶ 3(a) (privilege log); ¶ 3(b) (a monthly installment of privilege claims); ¶ 3(c) (reprocessing of selected 1B deletions); ¶ 3(d) (reprocessing of 1A deletions); ¶ 4 (presentation of plan for discovery completion). ¶¶ 3(c) and (d) have now been substantially satisfied, except possibly for some see-reference documents.

■ Upon a thorough review of the "history of this litigation." *Link v. Wabash Railroad*, 370 U.S. 626, 628, 82 S.Ct. 1386, 1387, 8 L.Ed.2d 734 (1962), and the "totality of the evidence," *Ohio v. Crofters, Inc.*, 74 F.R.D. 12, 15 (D.Colo.), *aff'd sub. nom., Ohio v. Arthur Andersen & Co.*, 570 F.2d 1370 (10th Cir.), *cert. denied*, 439 U.S. 833, 99 S.Ct. 114, 58 L.Ed.2d 129 (1978), I find that defendants' conduct in failing to comply with discovery orders[31] resulted from bad

---

**30.** Defendants' New York counsel could have been utilized and should be utilized in the future, even if this requires further security clearances for them. Special Agents could have also been used, even if this required a short training period, and they may have to be used in the future.

In other cases, defendants have used special agents—sometimes in large numbers (75–175) —to comply with discovery obligations. *See* 9/9/81 Tr. at 176–180; *American Civil Liberties Union v. City of Chicago*, 75 Civ. 3295 (N.D.Ill.); *Alliance To End Repression v. Rochford*, 74 Civ. 3268 (N.D.Ill.); *Socialist Worker's Party v. Attorney General, et al.*, 73 Civ. 3160 (S.D.N.Y.). As plaintiffs in a recent anti-trust case, some of these defendants joined in discovery efforts that resulted in the production of 26 million document pages for inspection and copying. Report to the President and Attorney General of the National Commission for the Review of Anti-trust Laws and Procedures, Volume II at p. 22 (1979).

The argument could perhaps be made that separation of powers considerations might inhibit a court from ordering the Executive Branch to devote more energy to its litigation tasks, cf. *In Re Attorney General, supra*, 596 F.2d at 64, but that argument has not yet been raised here. It would seem, however, that when the United

States waives tort immunity, it accepts the responsibilities that go along with the waiver. Congress cannot be thwarted by an executive decision to devote plainly insufficient resources to the litigation tasks that must be performed so that an immunity waiver is not illusory. In *United States v. Sumitomo Marine*, 617 F.2d 1365, 1370 (9th Cir. 1980), the United States attempted to deflect sanctions by arguing that it had insufficient resources. The court rejected this argument and stated "if the cause of the government's failures to comply with court orders is understaffing, then perhaps harsh measures will encourage those charged with funding and allocating personnel among the Justice Department's various offices to take ameliorating action."

**31.** Plaintiffs also seek sanctions for the government's opposition to their motion to compel privilege claims. I find that, although not completely justifiable, the government's opposition can be explained as an attempt to raise the possibility of alternative resolutions to the problem, other than individual submission of claims.

Plaintiffs are apparently no longer pursuing sanctions for document destruction.

faith, willfulness and fault. Hence, sanctions must be imposed. *See Roadway Express v. Piper*, 447 U.S. 752, 763–65, 100 S.Ct. 2455, 2462, 65 L.Ed.2d 488 (1980) (sanctions must be applied to penalize and deter); *National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976) (per curiam); *Penthouse Intern. Ltd. v. Playboy Enterprises*, 663 F.2d 371, 386–87 (1981); *Cine Forty-Second Street, supra*, 602 F.2d at 1066–67 (standard for imposition of sanctions is willfulness, bad faith or fault, which covers gross negligence). This case is celebrating its fifth anniversary. The defendants did not even put a dent in their discovery obligations until the past year. Their conduct has been dilatory, uncooperative and obstructionist. They are resisting the court's efforts to move the case along. Last Summer I declared this case a judicial emergency, Discovery Order No. 7. For five years, the judicial officers charged with responsibility for this case have been exhorting defendants to stop acting as though this case will never get to trial. And yet, despite this urgency, defendants' response to the *first timetable* established in this case was to do everything they could to force a showdown over it, even misrepresenting the timetable to Judge Brieant in an effort to have him set it aside and choosing to work on other tasks instead of those ordered by the court. If this conduct is tolerated, these proceedings will become a joke. "The judicial system cannot tolerate litigants who flagrantly refuse to comply with the orders of the court, for '[d]elay and evasion are added burdens on litigation, causing waste of judicial and legal time, are unfair to the litigants and offend the administration of justice.'" *Denton v. Mr. Swiss of Missouri*, 564 F.2d 236, 241 (8th Cir. 1977), *quoting Gulf Oil Co. v. Bill's Farm Center, Inc.*, 449 F.2d 778, 779 (8th Cir. 1971).

Rule 37(b) provides a court with wide discretion in selecting an appropriate sanction. Fines and costs may be imposed, even against the United States,[32] the offending party may be precluded from offering proof on particular issues, and, in an appropriate case, judgment may be entered against the offender. *Cine Forty-Second Street, supra*, 602 F.2d at 1063–64. The harshest sanctions are not available unless non-compliance has been due to willfulness, bad faith or fault, *Societe Internationale v. Rogers*, 357 U.S. 197, 212, 78 S.Ct. 1087, 1095, 2 L.Ed.2d 1255 (1958), but any sanction that is imposed must be more than a paper tiger and should be severe enough (1) to ensure that a party does not profit from its failure to comply; (2) to secure compliance; and (3) to deter future wrongdoing. *Cine Forty-Second Street, supra*, 602 F.2d at 1066. Moreover, "the effectiveness of and need for harsh measures is particularly evident when the disobedient party is the government. '[T]he public interest requires not only that Court orders be obeyed but further that Governmental agencies which are charged with the enforcement of laws should set the example of compliance with Court orders. *Perry v. Golub*, 74 F.R.D. 360, 366 (N.D.Ala.1976).'" *United States v. Sumitomo Marine & Fire Ins. Co.*, 617 F.2d 1365, 1370 (9th Cir. 1980) (affirming severe sanctions over government's protest that non-compliance with order stemmed from understaffing).

I find that there is no present basis for imposing the harshest sanctions. Trial is, regrettably, still far in the future, and, at the present time, imposition of the harshest sanctions would be out of proportion to the culpability of defendants and the prejudice suffered by plaintiffs.[33] I find that the purposes of Rule 37(b), as outlined above,

**32.** The Equal Access to Justice Act, P.L. 96–481; 94 Stat. 2325 (1980) repealed Rule 37(f), so that costs and fees sanctions may now be imposed against the United States.

The legislative history of this law is strewn with references to the United States and its agencies' abuse of the litigation process, and Congress expressed, through this law, the judg-

ment that the government may not be treated differently from other litigants. H.R.No.96–1418 (1980).

**33.** Although some false and many wrong statements have been made to the court, I make no finding that defendants have intentionally lied to the court. Nor do plaintiffs allege that defendants have intentionally lied to the court.

require instead (a) that plaintiffs be compensated for the fees and costs incurred in bringing this motion; (b) that defendants be placed on notice that *any* future failures to comply with court orders will meet with proof-preclusive or case dispositive sanctions, depending on the issues and documents to which the future failures, if any, relate; (c) that defendants comply within sixty (60) days with the provisions of the March 9, 1981 Order not yet satisfied, (including ¶ 4), under pain of further sanctions and adoption of the comprehensive discovery schedule proposed last Summer by plaintiffs. The discovery plan (¶ 4) shall provide, *inter alia*, for the completion of *all* document production and interrogatory responses within two years and shall outline any steps that would have to be taken to involve special agents, including field agents at the 59 field offices, and defendants' New York attorneys in document review and the making of supplementary answers to interrogatories. Payment of the fees and costs set forth in (a) above shall be made within thirty (30) days of the submission by plaintiffs and approval by me of an accounting in sworn form, itemizing costs, hours worked by each attorney and the regular hourly fee charged for such work.

D. CONCLUSION.

A case such as this, filled as it is with complex substantive and discovery issues and carrying the seeds of great burdens, places special demands on the parties and attorneys involved. The parties must recognize that once they fail to resolve discovery issues whose parameters they know better than anyone, they must be prepared to adhere to the orders of the court whose assistance they seek, whether or not they agree with those orders. The alternative is utter chaos. The parties' attorneys must recognize that they are officers of the court, as well as advocates, and as such they have an obligation to work with the court in meeting the challenges a case such as this presents to the judicial system, rather than

As to prejudice, the misconduct so far has related to a minority of the discovery tasks that

treating the court as an adversary and hiding the ball. This is a case that must end some day, not a holy war or an open forum for endless bickering, posturing and willful immersion in collateral issues. This case will come to an end soon, and it is up to the parties whether the issues are resolved on the merits before that happens.

will have to be performed by defendants, albeit a majority of tasks so far performed.